FIFTH DIVISION
July 30, 2010

No. 1-10-0132

| | | |
|---|---|---|
| *In re* ANAYA J.G., a Minor. | ) | Appeal from the |
| | ) | Circuit Court of |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| v. | ) | No. 06 JA 175 |
| | ) | |
| DEBRA J., | ) | The Honorable |
| | ) | Demetrios G. Kottaras, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE LAVIN delivered the opinion of the court:

In this case, we consider whether the notice provisions of the Indian Child Welfare Act should have applied in a termination of parental rights (TPR) hearing when there was some evidence that her maternal grandmother may have been affiliated with the Cherokee tribe.

BACKGROUND

Anaya J.G., the biological daughter of Debra J. and Larry G., was born drug exposed on February 14, 2006. Several weeks later, the circuit court took temporary custody of Anaya. Within two months of her birth, Anaya was placed in the foster care of Kevin W. and his wife, Geralyn W. Anaya is African-American. Kevin and Geralyn are Caucasian. On September 5, 2006, the circuit court found that Debra was unable, unwilling, and unfit to care for Anaya and adjudicated Anaya a ward of the court.

*Unfitness Finding*

On October 1, 2007, the State filed a petition to terminate the parental rights of Debra, alleging eight grounds of Debra's unfitness pursuant to section 50/1(D) of the Adoption Act of

1

1960 (750 ILCS 50/1(D) (West 2006)) and section 405/2-29 of the Juvenile Courts Act of 1987 (705 ILCS 405/2-29) (West 2006)). On November 18, 2009, at the conclusion of the TPR hearing, the circuit court found that the State had shown by clear and convincing evidence that Debra was unfit. In its written order entered December 7, 2009, the court found that Debra was a habitual drunkard who had deserted her newborn daughter and had failed to make any reasonable efforts toward reunification with her child. Among other evidence, the circuit court noted that Debra's participation in drug treatment was sporadic and inconsistent, with Debra testing positive for drug use in August and September 2008, and that Anaya's siblings were also born drug exposed. The court also noted that Debra's whereabouts were unknown from October 2008 through May 2009, and she went extended periods of time without visiting Anaya.

*Best Interest Hearing*

On December 7, 2009, the circuit court held the best interest portion of the TPR hearing. Debra was not present in court when the case was called at 10:16 a.m. The case was passed at that time, and Debra's counsel was permitted to check if Debra had left any messages. When he returned at approximately 10:30 a.m., he indicated that he had checked his messages and then renewed his request for a continuance, which was denied. The court stated that Debra had been in court on occasion, but had failed to appear on occasion, as well.

The State first called Deborah Buckles, the Department of Child and Family Services (DCFS) caseworker assigned to Anaya's case since June 8, 2007. Buckles recommended that it was in Anaya's best interest to terminate parental rights because she had been in the same foster home since April 2006; the foster parents had met all her special needs; they had provided a safe

and nurturing environment for her; it was the only home that Anaya had been stable in; and Anaya believed her parents were like biological parents. Buckles opined that Anaya and her foster parents had a "very close bond," and that Anaya "appeared to have a very loving and caring relationship with the foster parents." She believed Anaya felt "loved and secure in her foster home." Anaya referred to her foster mother, Geralyn, as "Mommy" and her foster father, Kevin, as "Daddy."

Buckles also testified that Anaya "was developing a bond with [Debra]. They [would] play together and she [would] allow [Debra] to pick her up." Anaya had never lived with Debra. Debra's last contact with Anaya was "approximately a couple of months" prior to the best interest hearing.

On cross-examination, Buckles explained that Debra began to visit with Anaya in either February or March of 2008 at her office. While Anaya's foster parents initially stayed in the room to help Anaya adjust to the visits, after the first two visits, they were asked to step out of the room. Buckles testified that it was difficult to get them out of the room. Buckles informed them that because the goal was for Anaya to "return home," the foster parents needed to work towards facilitating her return to Debra. The foster parents did not encourage Anaya to engage or bond with Debra and remained ambivalent regarding leaving the visitation room. On one visit in the middle of 2008, the foster parents talked in the room next door to the visiting room, which distracted Anaya. Buckles stated that the foster parents' behavior on these visits did not affect the bonding between Debra and Anaya.

Buckles stated that she did not recall the foster parents telling Anaya not to call her

3

biological parents mom and dad but recalled the foster parents' concern with whether Anaya was starting to get confused about having "two mommies and two daddies."

At the time of her testimony, Buckles expressed no concerns about the cultural differences between Anaya and her foster parents. Anaya's foster parents were given a cultural awareness CD by their licensing worker and had African American books and dolls for Anaya. At one point, Buckles was concerned that the foster parents did not know how to deal with Anaya's hair. Buckles explained that because they were not moisturizing her hair, it became "a little bit matted" at times. She later noticed the foster parents had picked up oils for Anaya's hair, which was "a good improvement." Moreover, Anaya's foster parents had not invited any extended biological family members to talk with Anaya and had not enrolled Anaya in any African American cultural awareness classes. Buckles also addressed her concern that the foster parents called Anaya "Annie" instead of by her given name.

Anaya's foster father, Kevin, took the stand next. Kevin explained some of Anaya's special needs, which included physical therapy, occupational therapy, and speech therapy. Among other activities, Anaya took swimming lessons and played on a soccer team. Kevin said he and his wife treated Anaya as if she was their own child. He testified that it was his and Geralyn's desire to adopt Anaya, and they had desired to do so since they first met Anaya. Kevin and Geralyn fostered a relationship with Anaya's biological sister Chanel, who lived in South Carolina, by exchanging cards at birthdays and holidays and sending pictures. Anaya also visited with her biological brother, Najm.

On cross-examination, Kevin stated that he and Geralyn took Anaya to Catholic church

but did not know the religion of Anaya's biological parents. Anaya had brought up the issue of race on one occasion when she said that her skin was brown and Geralyn's skin was white. When the permanency goal changed in late 2008 to "return home" he understood that to mean that Anaya would be re-united with her biological parents. Kevin and Geralyn did everything DCFS asked of them, which primarily involved taking Anaya to visits scheduled with her biological parents. He had hired an attorney, who suggested that they intervene in Anaya's case, but never actually did so. Kevin's opinion was that Debra had not shown much interest in Anaya. Kevin did not think it was in Anaya's best interest to know her biological parents until she was at least 18 years old.

Larry, Anaya's biological father, testified that he was Baptist. He was concerned that Anaya would grow up not knowing anything about her biological parents. Larry's opinion was that Anaya liked being around Debra and liked sitting in her lap. Debra had always told Larry that she did not want her parental rights terminated.

After arguments, the circuit court concluded that it was in Anaya's best interest to terminate parental rights and appointed D. Jean Ortega-Piron guardian with right to consent to adoption. The court took judicial notice of the evidence previously presented during the fitness proceedings. The court repeated its finding of unfitness as to Debra and Larry. The court determined that there was a lack of participation and inconsistency in the relationship between Debra and Anaya. The trial court compared that relationship to the "very positive nurturing relationship between [Anaya] and the foster parents." The trial court explained that Anaya was in a pre-adoptive home, and the placement was safe and appropriate.

The trial court considered that Anaya is African American and the foster parents are Caucasian. While the trial court was concerned with race and cultural issues, it believed "[i]ssues such as being there for the child, nurturing the child, being there for the child on a permanent basis as opposed to a sporadic and inconsistent basis is more important." The court then held a permanency hearing and entered a goal of adoption for Anaya.

*Evidence of Indian Heritage*

The record indicates three instances where Anaya's alleged Cherokee heritage was brought to the court's attention. The first instance occurred on September 28, 2007, at the temporary custody hearing for Anaya's brother, Najm. Debra stated that her mother's side of the family had Cherokee blood. Debra was not a registered member of any American Indian tribe. Debra did not know what band of Cherokee or whether any relatives were registered members. Debra's mother, Roszella, is deceased. Debra did not know her mother's birthday. The court informed Debra that it asked her about her heritage so the State could, if necessary, notify the Cherokee tribe of its right to intervene.

The second reference to Anaya's Cherokee heritage occurred on June 11, 2009, at the hearing on Larry's emergency motion for a continuance of the TPR hearing. Debra was not present but was represented by an assistant public defender. Larry stated that his civil rights had been violated, which included his "tribal rights." When asked about his Indian rights, Larry answered, "The child have Indian rights, Native American rights." The court then asked the parties if there were any issues of Indian tribal affiliation that required notification. The State represented that it was not aware of any tribal affiliation issues. When the State asked if Larry

6

was a member of a Native American tribe, he responded, "The Mother is." The State asked if the child was a member; he responded, "The Mother is." Larry was then sworn in as a witness and the parties questioned him under oath.

While under oath, Larry testified that he was not a member of any Native American tribe. When asked if his daughter, Anaya, was a member of any Native American tribe, he responded, "She is a – she is a Native American by – why you call it – the Grandmother descendent. The Grandmother was a Cherokee Indian, okay." Larry did not know if Anaya was a member of a Native American tribe or if the grandmother was a member of a Cherokee tribe. Larry said he knew Debra was a Cherokee Indian because they talked about it.

The third reference to Anaya's Indian heritage occurred at the TPR hearing on November 10, 2009. Larry again testified that Debra is a Native American and Anaya's grandmother was a "Cherokee, full blood." Larry reiterated that he is not a Native American.

### *Debra's Appeal*

On January 6, 2010, Debra filed a timely notice of appeal. Larry is not a party to this appeal.[1] Debra raises three issues on appeal. First, Debra contends that the circuit court erred in failing to notify the Cherokee tribe of the TPR proceedings, pursuant to section 1912(a) of the Indian Child Welfare Act of 1978 (the Act) (25 U.S.C. § 1912 (2006)), when it had been apprised that Anaya was possibly eligible for membership in the Cherokee tribe. Second, Debra contends

---

[1] In Larry's separate appeal, pursuant to *Anders v. California*, 386 U.S. 738, 18 L. Ed. 2d 493, 87 S. Ct. 1396 (1967), we found no issues of arguable merit to be asserted on appeal, granted Larry's appointed counsel's motion for leave to withdraw, and affirmed the order of the circuit court.

that she was denied due process where the trial court denied her motion for a continuance and conducted the best interest hearing in her absence. Third, Debra contends that the circuit court's finding that it was in Anaya's best interests for her mother's parental rights to be terminated was against the manifest weight of the evidence.

ANALYSIS

Debra first contends that the circuit court erred in failing to notify the Cherokee tribe of the TPR proceedings pursuant to the Act. Debra requests that we reverse and remand to the circuit court for further proceedings in compliance with the Act. Whether the circuit court was required to give notice to the Cherokee tribe under the Act involves an issue of statutory interpretation, which we review *de novo*. *In re T.A.*, 378 Ill. App. 3d 1083, 1087 (2008).

The Act governs child-custody proceedings involving Indian children, including foster-care placements, the terminations of parental rights, and adoptive placements. 25 U.S.C. §§ 1902, 1903 (2006). "Indian tribes, functioning as autonomous communities, have a separate interest in the potential Indian child welfare proceedings from the parties involved." *T.A.*, 378 Ill. App. 3d at 1092. Accordingly, the Act provides that if the circuit court "knows or has reason to know" that an Indian child is involved in an involuntary custody proceeding, the party seeking the foster-care placement of the Indian child must notify the parent or Indian custodian and the Indian child's tribe of the pending proceeding and their right to intervene. 25 U.S.C. § 1912(a) (2006). The Act defines "Indian child" as an unmarried person under the age of 18 who "is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4).

8

We must determine whether the circuit court had a "reason to know" Anaya was an Indian child. Debra does not argue on appeal that Anaya satisfies the requirements of section 1903(4)(b) as both Debra and Larry testified that they were not members of an Indian tribe. Debra contends that, pursuant to section 1903(4)(a), the circuit court had reason to know that Anaya is a member of an Indian tribe. Put another way, Debra contends that there was sufficient evidence to establish that Anaya herself could have been a member in her own right based on her own status as the granddaughter of a Cherokee Indian. While we agree that Anaya's status as an Indian child does not exclusively depend on her biological parents' tribal membership, we disagree with Debra's assessment of the evidence. We conclude that under the facts in this record, there was insufficient evidence to give the trial court reason to know that Anaya is a member of an Indian tribe.

*In re T.A.* is instructive. There, the appellate court found that the evidence of the child's Indian heritage was "unsubstantiated and vague" and did not give the trial court reason to know that the child was an Indian child so as to trigger the notice requirements under the Act. *T.A.*, 378 Ill. App. 3d at 1094. The evidence of the child's Indian heritage consisted of the biological mother's statements to a caseworker that she was of Native American descent, and that she was unaware if any of her family members were registered with any tribes. *T.A.*, 378 Ill. App. 3d at 1093. The *T.A.* court explained that while membership in a particular tribe is not easily determined, "the mere mention of Indian heritage does not give a trial court reason to know that the child is an Indian child." *T.A.*, 378 Ill. App. 3d at 1092.

As in *T.A.*, we conclude that Anaya was not an Indian child pursuant to the Act because there was insufficient evidence to establish that she is a member of an Indian tribe. The record

9

indicates that there was no evidence presented at trial that Anaya herself is a member of an Indian tribe. Neither Debra nor Larry are members of an Indian tribe. While Debra represented that there is Cherokee blood on her deceased mother's side of the family, she did not know what band of Cherokee or whether any relatives were registered members of the Cherokee tribe. Larry similarly stated that he believed Anaya's maternal grandmother was a Cherokee Indian, but that he did not know if the grandmother was a member of the tribe. The circuit court allowed all of the parties to question Larry about Anaya's Indian heritage. All of the parties seemingly agreed that there was no reason to know that Anaya was an Indian child so as to trigger the notification provisions of the Act. These bare assertions without any evidence that any of Anaya's relatives were members of the Cherokee tribe did not give the circuit court reason to know that Anaya is an Indian child. Based on these facts, we cannot invalidate the circuit court's determination pertaining to Anaya's status as an Indian child. Accordingly, the circuit court did not err in failing to notify the Cherokee tribe of the proceeding and its right to intervene.

Debra next contends that she was denied due process where the trial court denied her motion for a continuance and conducted the best interest hearing in her absence. "It is within the juvenile court's discretion whether to grant or deny a continuance motion and the court's decision will not be disturbed absent manifest abuse or palpable injustice." *In re K.O.*, 336 Ill. App. 3d 98, 104 (2002). There is no absolute right to a continuance. *K.O.*, 336 Ill. App. 3d at 104. "The denial of a request for continuance is not a ground for reversal unless the complaining party has been prejudiced by such denial." *K.O.*, 336 Ill. App. 3d at 104. "Although a parent has a right to be present at a hearing to terminate parental rights, it is not mandatory that he or she be present,

10

and the circuit court is not obligated to wait until he or she chooses to appear." *K.O.*, 336 Ill. App. 3d at 105.

Here, the record indicates that the best interest hearing was set to be heard on December 7, 2009 at 9:00 a.m. Debra was not present when the case was called at 10:16 a.m. The case was passed at that time, and Debra's counsel was permitted to check if Debra had left any messages. When he returned, he indicated that he had checked his messages and then renewed his request for a continuance, which was denied. The court noted that Debra had been inconsistent in her court appearances. Under these circumstances, the circuit court did not abuse its discretion in denying Debra's motion for a continuance.

Debra next contends that the circuit court's finding that it was in Anaya's best interests for her mother's parental rights to be terminated was against the manifest weight of the evidence. Debra does not challenge on appeal the circuit court's finding of unfitness during the TPR hearing. Once a trial court finds a parent unfit, the court must then determine whether termination of parental rights is in the best interests of the child. *In re Janira T.*, 368 Ill. App. 3d 883, 894 (2006). In making this determination, the court is required to consider factors such as the child's physical safety and welfare; the development of the child's identity; the child's background and ties, including familial, cultural, and religious; the child's sense of attachments; the child's wishes and long-term goals; the child's community ties, including church, school, and friends; the child's need for permanence, including her need for stability and continuity with parental figures and other relatives; the uniqueness of every family and child; the risks related to substitute care; and the preferences of the person available to care for the child. 705 ILCS

11

405/1–3(4.05) (West 2008).

The State bears the burden of proving by a preponderance of the evidence that termination is in the child's best interests. *Janira T.*, 368 Ill. App. 3d at 894. The trial court's finding that termination is in the child's best interest will not be disturbed unless it is against the manifest weight of the evidence. *In re Tasha L. -I.*, 383 Ill. App. 3d 45, 52 (2008). "A decision is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings are unreasonable, arbitrary, and not based upon any of the evidence." *Tasha L.. -I.*, 383 Ill. App. 3d at 52.

A review of the record shows that the trial court's decision to terminate Debra's parental rights as to Anaya was not contrary to the manifest weight of the evidence. Evidence presented at the best interest hearing revealed that there was a lack of participation and inconsistency in the relationship between Debra and Anaya. On the contrary, the evidence suggests that Anaya has a positive, safe, and nurturing relationship with her foster parents that she has lived with since she was about six weeks old. While there are cultural differences, the trial court explained, "issues such as being there for the child, nurturing the child, being there for the child on a permanent basis as opposed to a sporadic and inconsistent basis is more important." We agree. When considering all of the statutory factors, we find the circuit court's best interest determination to be supported by the manifest weight of the evidence.

## CONCLUSION

For the foregoing reasons, we affirm the order of the circuit court.

12

Affirmed.

TOOMIN, P.J., and HOWSE, J., concur.

1-10-0132

| | |
|---|---|
| Please Use Following Form: | |
| Complete TITLE of Case | *In re* ANAYA J.G., a Minor.<br><br>(THE PEOPLE OF THE STATE OF ILLINOIS,<br><br>Petitioner-Appellee,<br><br>v.<br><br>DEBRA J.,<br><br>Respondent-Appellant). |
| Docket No.<br><br>COURT<br><br>Opinion Filed | No. 1-10-0132<br>Appellate Court of Illinois<br>First District, FIFTH Division<br>July 30, 2010<br>(Give month, day and year) |
| JUSTICES | JUSTICE LAVIN delivered the opinion of the court:<br>Toomin, P.J., and Howse, J.    concur<br>   dissent[s] |
| APPEAL from the Circuit Ct. of Cook County, Criminal Div. | Lower Court and Trial Judge(s) in form indicated in the margin:<br>The Honorable Demetrios G. Kottaras, Judge Presiding.<br>Indicate if attorney represents APPELLANTS or APPELLEES and include<br>attorneys of counsel. Indicate the word NONE if not represented. |
| For APPELLANTS, John Doe, of Chicago.<br><br>For APPELLEES, Smith and Smith of Chicago, Joseph Brown, (of Counsel)<br><br>Also add attorneys for third-party appellants or appellees. | Attorneys for Petitioner-Appellee:   Anita Alvarez, State's Attorney<br>People<br>   Richard J. Daley Center, Room 309<br>   Chicago, IL 60602<br>   312.603.5496<br>Anaya J   Office of the Cook County Public Guardian<br>   Robert Harris, Kass Plain, Jean Agathen<br>   2245 W. Ogden Ave., 4th Floor<br>   Chicago, IL 60612<br>   312.433.4300<br>Attorneys for Respondent-Appellant:   Abishi C. Cunningham, Jr., Public Defender<br>Debra J.   James Jacobs<br>   69 W. Washington St., 15th Floor.<br>   Chicago, IL 60602<br>   312.603.0600 |