NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 200336-U

NOS. 4-20-0336, 4-20-0337 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 16, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* Aai. J., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Woodford County |
|      Petitioner-Appellee, | ) | No. 18JA41 |
|      v.     (No. 4-20-0336) | ) | |
| Alex J., | ) | |
|      Respondent-Appellant). | ) | |
| | ) | |
| ------------------------------------------------------------------ | ) | |
| *In re* Aar. J., a Minor | ) | No. 18JA42 |
| | ) | |
| (The People of the State of Illinois, | ) | |
|      Petitioner-Appellee, | ) | |
|      v.     (No. 4-20-0337) | ) | Honorable |
| Alex J., | ) | Charles M. Feeney III, |
|      Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices Turner and Harris concurred in the judgment.

**ORDER**

¶ 1     *Held*: The appellate court affirmed the trial court's judgments, concluding (1) the court's best-interest findings were not against the manifest weight of the evidence and (2) respondent did not receive ineffective assistance of trial counsel.

¶ 2     Respondent father, Alex J., appeals from the trial court's judgments terminating his parental rights to Aai. J. (born January 17, 2015) and Aar. J. (born March 23, 2016). On appeal, respondent argues (1) the court's best-interest findings are against the manifest weight of the evidence and (2) his trial counsel rendered ineffective assistance by failing to present testimony from additional witnesses at the best-interest hearing. For the reasons that follow, we affirm the

trial court's judgments terminating respondent's parental rights.

¶ 3                                    I. BACKGROUND

¶ 4        Respondent and Samantha T. are the minors' biological parents. Samantha T.'s parental rights to the minors were terminated pursuant to a voluntary and irrevocable surrender, and she is not a party to this appeal.

¶ 5                            A. Adjudications of Neglected

¶ 6        In October 2018, the State filed petitions for adjudication of wardship, alleging, in part, the minors were neglected in that they were subject to an environment injurious to their welfare because their residence was "extremely dirty, smells horrible, and has animal feces in living areas of the home." 705 ILCS 405/2-3(1)(b) (West 2016). That same month, the trial court appointed respondent counsel and entered orders granting temporary custody to the Department of Children and Family Services (DCFS).

¶ 7        On November 30, 2018, the trial court entered adjudicatory orders finding the minors to be neglected. As a factual basis, the court indicated, in part, the "living conditions of [respondent's] residence are deplorable."

¶ 8        In January 2019, the trial court entered dispositional orders adjudicating the minors wards of the court and placing guardianship and custody with DCFS.

¶ 9                        B. Petitions to Terminate Parental Rights

¶ 10       In December 2019, the State filed petitions to terminate respondent's parental rights to the minors. In its petitions, the State alleged respondent was an unfit parent as he (1) failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minors during certain nine-month periods following the adjudications of neglected (750 ILCS 50/1(D)(m)(i) (West 2018)), namely December 1, 2018, to September 1, 2019, and March 12,

2019, to December 12, 2019; and (2) failed to make reasonable progress toward the return of the minors to his care within certain nine-month periods following the adjudications of neglected, namely December 1, 2018, to September 1, 2019, and March 12, 2019, to December 12, 2019 (750 ILCS 50/1(D)(m)(ii) (West 2018)). The State further alleged it was in the minors' best interests to terminate respondent's parental rights and appoint DCFS as guardian with the power to consent to adoption.

¶ 11                                    C. Unfitness Admission

¶ 12        At a February 2020 hearing, respondent admitted to the allegations of unfitness set forth in the State's petitions to terminate parental rights. The State provided the following factual basis in support of the admission:

> "[W]itnesses would testify that case[]workers from [FamilyCore] and [DCFS] would state that [respondent] has been made aware of what he needs to do as far as services, including drug drops, mental health counseling, maintaining employment, reporting to case[]workers. If I didn't say it, drug and alcohol evaluation and treatment with drops. He has not completed the drops for a substantial period of time, many months. On the last review period especially he had not completed any drug drops. He had not completed parenting classes, mental health counseling as requested through the service plan in any of these time periods. And he has not—he has not kept in total contact at all times with the case[]worker[s] during the times alleged, December 1st, 2018, to September 1st, 2019, as well as March 12th, 2019, to December

- 3 -

12th, 2019.

> The evidence would show that progress and efforts has not been reasonable by [respondent], and there has not been much progress towards the return home of the minors during any of those reporting periods or nine-month periods."

Respondent, through counsel, acknowledged the State could substantiate the factual basis. The trial court accepted respondent's unfitness admission, finding it to be knowingly and voluntarily made and supported by a sufficient factual basis.

¶ 13                          D. Best-Interest Hearing

¶ 14          In June 2020, the trial court conducted a best-interest hearing. The court received a best-interest report and an addendum. The court heard testimony from Andrea J., the minors' foster mother, respondent, and the caseworker who had served on the minors' cases since October 2019 and had prepared the best-interest report and the addendum. The following is gleaned from the evidence and testimony presented.

¶ 15          In October 2018, the minors were taken into DCFS care after police responded to the home where the minors resided with respondent and his parents. The police were dispatched to the home due to a domestic dispute between respondent and his father. Inside the home, there was reportedly garbage all over, a foul odor, several dogs running around, and the presence of flies. The minors' feet were black. At the minors' initial health exams, it was discovered Aar. J. had splinters in his right foot, and Aai. J. had several insect bites. Respondent, respondent's parents, and police agreed the home was unsafe and unacceptable for children.

¶ 16          After the minors were taken into DCFS care, they were placed with their foster mother, who was also their paternal aunt. They then remained with their foster mother during the

pendency of their cases. The minors were happy and healthy. The minors and their foster mother were bonded to each other. The minors referred to their foster mother as "mom." They looked to her for safety and support. The minors' needs and interests were being met by their foster mother. They attended medical appointments and took required medications. They attended the same preschool. The foster mother testified about recently spending over $1000 from a tax refund on school clothes and shoes for the minors. The minors attended church, where they had made friends. They also had made friends from school and from the neighborhood where they resided. The minors attended family gatherings. Given the familial relationship between the foster mother and respondent, respondent was present at the family gatherings with DCFS approval. The minors' foster mother was willing to adopt the minors if respondent's parental rights were terminated. If adopted, the foster mother testified she would permit respondent to spend time with the minors only if it was supervised.

¶ 17 Respondent had cared for the minors since their birth. A bond existed between the minors and respondent. The foster mother testified the minors recognized respondent as their father and looked forward to interacting with him. Respondent's attendance at weekly visitation throughout the minors' cases was inconsistent. Respondent reported to the foster mother his lack of attendance was due to his vehicle not working, not having gas for his vehicle, or being sick. After visitation was changed from weekly to monthly earlier that year, respondent's attendance at visitation improved. At one point, respondent was given approval to attend a scheduled surgery where Aai. J. would have his tonsils and adenoids removed. Respondent arrived an hour after Aai. J. had gone into surgery. Respondent's inconsistent attendance at visitations made a demonstrable, negative impact on the minors. At one point, Aai. J. looked to his foster mother for support after believing respondent's inconsistencies were his fault. There were also instances where the minors

did not include respondent as part of their family for school projects and where they stated they wished to be adopted. Aai. J. asked Santa Claus if he could be adopted for Christmas.

¶ 18    As part of his required services, respondent was to fully cooperate with DCFS and its designees, complete parenting classes, complete a mental health assessment and any recommended treatment, complete a drug and alcohol assessment and any recommended treatment, and complete two random drug drops per month. Respondent's cooperation with DCFS and its designees was inconsistent. Respondent had not completed parenting classes. He started the classes in 2020 but had to retake them as he did not complete all of them. Respondent testified he did not start the classes until 2020 because he had enrollment issues. Respondent did not complete the mental health assessment. Respondent testified he previously completed a mental health assessment but, because the assessor was not properly trained, he had to redo the assessment and was waiting on an agency to provide him with another assessment. Respondent completed a drug and alcohol assessment. Respondent testified he completed "level 2 treatment" and was still working on "level 1" treatment. The caseworker testified she had no information about respondent's treatment as respondent's authorization for release of information had expired. Respondent never completed a drug drop with the agency assigned to monitor the minors' cases. Respondent testified he was unable to do so because he had trouble urinating while the agency's employees were present. Respondent also testified he consistently completed drug drops as part of a probation sentence, a sentence which he was still serving for two deceptive practices and a forgery.

¶ 19    Respondent was unemployed. Respondent testified he was unemployed due to a back issue and was seeking disability benefits. He maintained his back issue would not hinder his ability to care for the minors.

¶ 20    Respondent acknowledged having a "profound cannabis use history." When asked if he still used cannabis, respondent testified, "I have used CBD lotions for my back. I have used CBD gummies. They say they contain little to no THC, but I am sure they have a little bit of THC in them." Respondent testified he no longer smoked "pot."

¶ 21    Respondent lived with his parents. Respondent testified about a trailer he owned. He had replaced flooring, piping, and heating in the trailer and was working on replacing the drywall. Respondent's fiancée resided in the trailer with her children. Respondent testified there would be space in the trailer for him, his fiancée, the minors, and his fiancée's children.

¶ 22    On May 28, 2020, DCFS opened an investigation into an incident involving respondent and his fiancée. The incident involved an argument between respondent and his fiancée while his fiancée's children were present. Respondent was to have no contact with his fiancée's children until the investigation was resolved.

¶ 23    The caseworker assigned to monitor the minors' well-being believed it would be in the minors' best interests to terminate respondent's parental rights. She did not believe respondent at the time was capable to caring for the minors. The minors' foster mother believed it would be in the minors' best interests to have a relationship with respondent. However, she also believed the minors needed stability and permanency, needs which she believed respondent could not fulfill at the time, and it would be in the minors' best interests to remain with her. Respondent believed he could care for the minors and requested to do so. Both the State and the guardian *ad litem* recommended respondent's parental rights be terminated.

¶ 24    After receiving the evidence and recommendations, the trial court made the following oral pronouncement:

"This is the second phase, the best interests phase. And the best

interests are to be determined by a preponderance of the evidence.

So when we look at best interests I have looked at the statute in question, and the statute says the following factors shall be considered in the context of the child's age and developmental needs. First factor, the physical safety and welfare of the child, including food, shelter, health, and clothing. In a lot of cases that is not as primary a factor. It's always a primary factor, but it's not the key factor. In this case it actually is the key factor given the home. I mean, when we reflect on the—what gave rise to this case the children's feet were black, they had insect bites. The—everyone agreed the home was uninhabitable for children and probably for everyone. But the—so—and the foster mom's home is not—does not have any problem whatsoever.

The development of the child's identity. And I'm going to combine that with the next factor, which is the child's background and ties, including familial, cultural, and religious. Those are going to be largely the same. And the foster mom is taking the child to church. They like church. She has had them in daycare, preschool, if you will, and they like that. The—but it's the same family. So those ties will remain.

The child's sense of attachment. This is—helps [respondent] a little bit, because they do have a sense—by all accounts they have a sense of attachment to [respondent]. But we also have evidence

that that attachment is waning. But the foster mom['s] *** testimony is very clear that they love him very much and they are attached to him. And the beauty of this situation is—and I really—I haven't done that yet, and I need to say to [Andrea J.], the foster mom, the court appreciates your efforts in taking care of these young folks. And I'm sure it's a difficult situation from the standpoint of your brother. He should be grateful. I don't know that he is. But he should be grateful to you for caring for the most precious things that he has in this world, and that's his children. But the court appreciates it and commends you for it.

But they clearly—the children have a sense of attachment with their foster mom. I am absolutely convinced of that. And when you look at what—that sense of attachment where the child actually feels loved, clearly that's with foster mom. And may be with dad as well. The child's sense of security and familiarity is with foster mom. The continuity of affection for the child is with foster mom.

And then you get to the fifth aspect of that attachment, the least disruptive placement alternative for the child. The least disruptive place is, clearly, foster mom. And why do I say that? Well, dad isn't out of his home in El Paso right now merely because of what, remodeling, or whatever. He is not because of his unfitness. He is out because of some domestic situation that's developed as well. So, again, that's misleading to say that it's only because of

these other reasons when it's actually also related to his inappropriate conduct with his [fiancée] in front of children.

Then you get to the next overall factor, the child's wishes and long-term goals. Those favor foster, granting the termination. The child's wishes being—although I am not giving a ton of weight to that, but the wish to Santa Claus to be adopted, I think that in a child's way expresses the frustration of probably missed visits and things like that.

The child's community ties. Church, school, and friends. The child has developed friends. The church and school are going to remain—would remain the same either way, so they're not disrupted.

The next factor is huge. The child's need for permanence, which includes the child's need for stability and continuity with relationship with parent figures, with siblings, and other relatives. That, clearly, favors termination here. [Respondent's] life is—was and is chaos.

The uniqueness of every family and child. That will—again, the family situation will continue. The other factors really don't have a huge impact.

I am struck in this case with the tale of two courses of action, you know. Somebody is full of baloney here, I think to a great extent. I mean, I hear no drug drops. You know, just one failure after

another. And [respondent] says yeah, I've done everything, basically. I've done everything. And I find that hard to believe. I find that very hard to believe. Because the issues here, these are not new. These issues have existed in this case for a substantial period of time. The complaints about [respondent] not doing his drug drops have been around for a long time, and he is still not doing them. And that—you don't do your drug drops, there is a reason. And you can say you have a shy bladder, but two years of a shy bladder is a little hard to accept. And we're close to two years, I should say.

But one of the things I am struck with, and it's that he loves his kids. That's what we are saying. And they love him. But the interesting thing about love—and we throw that word around. And that is to say, I think as it's been used here, is people have feelings for certain things, you know. He has feelings for his kids and his kids have feelings for him. And—but the love of a parent is a love of action. Love does. It's not just a feeling that's experienced. It's an action we take. And that's the love of a parent, and that's the love that [Andrea J.] has shown to these children. She loves them. She wants to give them within her means everything she can.

So many people are focused on their own selfish interests. She gets her tax refund, she nearly blows the whole thing—and I say blows. I shouldn't have said that. It's not wasted. That would be indicating it's a waste. But she spends the whole thing, it sounds

like, on the kids and providing them what? Clothes, shoes, the fundamental things we all need in this world. But she gets them their physical. She takes care of them. That is love. And from the standpoint of a parent that has children in foster care, what is love? Love is standing in front of someone else and urinating into a cup. Love is getting your parenting classes done and not having cheap excuses. Love is getting your drug treatment done. Love is doing your after-care. These things—that's how love exemplifies itself.

And it's clear in this case that the best interests of the [minors] favor granting the petition ***."

The court thereafter entered written orders terminating respondent's parental rights to each minor.

¶ 25       This appeal followed.

¶ 26                                II. ANALYSIS

¶ 27       On appeal, respondent argues (1) the trial court's best-interest findings are against the manifest weight of the evidence and (2) his trial counsel rendered ineffective assistance by failing to present testimony from additional witnesses at the best-interest hearing. The State disagrees with each of respondent's arguments.

¶ 28                            A. Best-Interest Findings

¶ 29       Respondent argues the trial court's best-interest findings are against the manifest weight of the evidence. Specifically, respondent contends the court did not "properly weigh" the statutory best-interest factors in reaching its best-interest findings.

¶ 30       "The termination of parental rights is a two-step process under which the best interests of the child is considered only after a court finds the parent unfit." *In re E.B.*, 231 Ill. 2d

459, 472, 899 N.E.2d 218, 226 (2008); see also 705 ILCS 405/2-29(2) (West 2018). At the best-interest stage, the State must prove termination is in a child's best interests by a preponderance of the evidence. *In re D.T.*, 212 Ill. 2d 347, 367, 818 N.E.2d 1214, 1228 (2004).

¶ 31 When considering whether the termination of parental rights would be in a child's best interests, the trial court must consider the following statutory factors within the context of the child's age and developmental needs: the child's physical safety and welfare; the development of the child's identity; the child's family, cultural, and religious background and ties; the child's sense of attachments, including continuity of affection for the child, the child's feelings of love, being valued, and security, and taking into account the least-disruptive placement for the child; the child's own wishes and long-term goals; the child's community ties, including church, school, and friends; the child's need for permanence, which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives; the uniqueness of every family and child; the risks attendant to entering and being in substitute care; and the wishes of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2018).

¶ 32 On review, this court will not reverse a trial court's best-interest finding unless it is against the manifest weight of the evidence. *In re Anaya J.G.*, 403 Ill. App. 3d 875, 883, 932 N.E.2d 1192, 1199 (2010). A finding is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *Id.*

¶ 33 Here, the minors had resided with their foster mother since they were taken into DCFS care. They were happy, healthy, and bonded to their foster mother. Their needs and interests were being met. Their foster mother was willing to provide them with permanency through adoption. While the minors' parent-child relationship with respondent was waning, their foster mother indicated she would continue to provide them with supervised opportunities to interact

with respondent even if they were adopted, opportunities which she believed were in the minors' best interests.

¶ 34    Conversely, respondent failed to consistently attend visitation with the minors, which had a demonstrable, negative impact on the minors' relationship with respondent. Respondent also failed to complete all the required services, raising doubt as to his ability to care for the minors' well-being. While respondent hoped his trailer could serve as adequate housing for the minors, the minors could not reside there so long as respondent's fiancée and her children did due to the ongoing DCFS investigation into the argument between respondent and his fiancée in front of her children.

¶ 35    Ultimately, respondent's interest in maintaining the parent-child relationships had to yield to the minors' interests in a stable, loving home life. See *In re D.T.*, 212 Ill. 2d 347, 364, 818 N.E.2d 1214, 1227 (2004). Based on the evidence presented, we find the trial court's best-interest findings are not against the manifest weight of the evidence.

¶ 36                      B. Ineffective Assistance of Trial Counsel

¶ 37    Respondent argues his trial counsel rendered ineffective assistance by failing to present testimony from additional witnesses at the best-interest hearing. Specifically, respondent contends counsel should have called his probation officer, his other caseworkers, and his counselor as their testimony "may very well have corroborated" his testimony and, therefore, changed the trial court's finding that he was "full of baloney."

¶ 38    In a proceeding to terminate parental rights, "parents are entitled to effective assistance of counsel." *In re M.F.*, 326 Ill. App. 3d 1110, 1119, 762 N.E.2d 701, 709 (2002). To establish a claim of ineffective assistance of counsel, a parent must show (1) counsel's performance fell below an objective standard of reasonableness and (2) a reasonable probability

that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *In re A.R.*, 295 Ill. App. 3d 527, 531, 693 N.E.2d 869, 873 (1998). "Failure to satisfy either prong precludes a finding of ineffective assistance of counsel." *In re A.P.-M.*, 2018 IL App (4th) 180208, ¶ 41, 110 N.E.3d 1126.

¶ 39    Here, even if respondent's trial counsel had presented testimony from the alleged witnesses and that testimony corroborated respondent's testimony and changed the trial court's finding that respondent was "full of baloney," we are unconvinced the result of the proceeding would have been different. The court's comment suggesting it believed respondent was "full of baloney" related to respondent's excuses for failing to complete the required services. The court made clear, however, that even if respondent's excuses had some validity, respondent had the responsibility to work with DCFS and its designees to resolve the issues while the minors were in DCFS care. Given the court's reasoning and the other evidence presented at the best-interest hearing, we are unconvinced respondent's trial counsel rendered ineffective assistance by failing to present testimony from the additional witnesses.

¶ 40                                III. CONCLUSION

¶ 41    We affirm the trial court's judgments.

¶ 42    Affirmed.