NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 220043-U

NOS. 4-22-0043, 4-22-0044 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 13, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* S.H., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Tazewell County |
|       Petitioner-Appellee, | ) | No. 16JA145 |
|       v.     (No. 4-22-0044) | ) | |
| Rochelle S., | ) | |
|       Respondent-Appellant). | ) | |
| ------------------------------------------------------------------------ | ) | |
| *In re* K.S., a Minor | ) | No. 18JA140 |
| | ) | |
| (The People of the State of Illinois, | ) | |
|       Petitioner-Appellee, | ) | |
|       v.     (No. 4-22-0043) | ) | Honorable |
| Rochelle S., | ) | Mark E. Gilles, |
|       Respondent-Appellant). | ) | Judge Presiding. |

PRESIDING JUSTICE KNECHT delivered the judgment of the court.
Justices Holder White and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed the trial court's judgments, concluding (1) respondent did not receive ineffective assistance of counsel during her fitness hearing and (2) the trial court's best-interest findings were not against the manifest weight of the evidence.

¶ 2    Respondent mother, Rochelle S., appeals from the trial court's judgments terminating her parental rights to K.S. (born August 13, 2018) and S.H. (born November 30, 2016). On appeal, respondent argues (1) her counsel provided ineffective assistance during her fitness hearing and (2) the trial court's best-interest findings are against the manifest weight of the evidence. For the reasons that follow, we affirm the trial court's judgments.

## I. BACKGROUND

¶ 4 The parental rights of Shane H., the biological father of S.H. and putative father of K.S., were also terminated during the proceedings below. He is not a party to this appeal.

### A. Amended Petitions to Terminate Parental Rights

¶ 6 In October 2020, the State filed amended petitions to terminate respondent's parental rights to the minors. The State alleged respondent was an unfit parent in that she suffered from a mental impairment, mental illness, intellectual disability, or developmental disability that prevented her from discharging her parental responsibilities and that inability to discharge parental responsibilities would persist for an unreasonably long time. 750 ILCS 50/1(D)(p) (West 2020).

### B. Fitness Hearing

¶ 8 Over a five-day period between June and November 2021, the trial court conducted a fitness hearing. The State presented testimony from multiple caseworkers, a case supervisor, and a case assistant as well as several exhibits. Respondent presented her own testimony as well as a letter she prepared for the court. The following is gleaned from the evidence presented.

### 1. *State's Exhibit No. 1*

¶ 10 State's Exhibit No. 1, which was admitted by agreement, includes an October 31, 2017, psychological evaluation and a December 11, 2020, letter, both of which were prepared by a clinical psychologist, Dr. Rudolf Breitmeyer. In the psychological evaluation, Dr. Breitmeyer found respondent to have a Full-Scale IQ of 63 and offered, amongst other conclusions, the following conclusion:

> "Results of this evaluation indicate that [respondent] is functioning in the extremely low range of intelligence and exhibits significant impairment in both verbal cognitive and reason problem-

solving skills and [nonverbal] reasoning and problem-solving skills. Results of this evaluation support the impression that [respondent] exhibits mild to moderate deficits in her receptive vocabulary. Pertaining to her academic functioning, results of this evaluation point to pervasive and significant deficits in her math skills and supports the impression that reading comprehension appears to be a relative strength. In this context, and in conjunction with background information which reflects significant deficits in [respondent's] adaptive behavioral functioning, the current results support the impression that [respondent] is not likely to be able to, from an intellectual and academic/functional skills perspective, of [*sic*] parenting her son [S.H.] on an independent basis. By the same token, results of a formal assessment of adaptive behavioral functioning by means of the Vineland are needed to make a more definitive statement regarding [respondent] not being able to parent [S.H.] on an independent basis."

In the letter, Dr. Breitmeyer states, "It is likely that [respondent's] intellectual functioning has not changed since the October 2017 evaluation[;] however, I cannot make any comments related to her current psychological functioning including any impairment in psychological functioning." With respect to not commenting on respondent's psychological functioning, Dr. Breitmeyer noted the three-year interval since his evaluation of respondent as well as the fact he had retired and was no longer licensed.

¶ 11                           2. *State's Exhibit No. 2*

¶ 12    State's Exhibit No. 2, which was also admitted by agreement, includes a June 15, 2019, parenting capacity assessment and a December 9, 2020, letter, both of which were prepared by a clinical psychologist, Dr. Jane Velez. In the parenting capacity assessment, Dr. Velez diagnosed respondent with (1) Bipolar I Disorder, Manic Type, Without Psychotic Features; (2) Generalized Anxiety Disorder; (3) Panic Disorder without Agoraphobia; (4) Posttraumatic Stress Disorder NOS, By History; (5) Phonological Disorder; (6) Learning Disorder in Mathematics; and (7) Intellectual Disorder. Dr. Velez further opined respondent's "problems are a combination of both" her mental illness and cognitive defects. In the letter, Dr. Velez opined (1) respondent "has a bonafide [*sic*] mental illness and cognitive impairment as defined by Section[s] 1-116 and 1-106 of the Mental Health and Developmental Disabilities Code"; (2) respondent "cannot successfully parent her children, nor can she protect them from physical harm"; (3) "there is sufficient justification to believe that [respondent's] inability to discharge parental responsibilities will extend beyond a reasonable time period"; and (4) respondent has Intellectual Disorder which "is considered to be a lifelong impairment."

¶ 13                3. *Testimony From the State's Witnesses*

¶ 14    The testimony from the caseworkers, the case supervisor, and the case assistant largely concerned the witnesses' observations about respondent's ability to care for herself and the minors at various points between 2016 and April 2021. During that period, respondent was offered services, which she completed, and visitations, which she attended.

¶ 15    The primary, continuing concern by the witnesses involved respondent's ability to recall and implement recommendations given to her related to caring for herself and the minors. Respondent struggled with providing the minors with appropriate food, attention, and safety. For instance, respondent had to be repeatedly reminded of the need to prepare food for the minors of

an appropriate size, to wash her hands after checking or changing a diaper, to engage with the minors rather than taking pictures and videos of them, to assure the needs of both minors were being met, to pick up toys from the ground which were safety risks, and to pick up the minors in an appropriate manner, *i.e.*, not by one arm. Respondent also struggled with providing care for herself. For instance, respondent had to repeatedly be reminded of the importance of hygiene. At one point, respondent was evicted because of bedbugs, and she reported the infestation only after it was noticed she was itching during a visitation.

¶ 16    Another concern by the witnesses involved respondent's responses to certain situations. Respondent struggled with accepting recommendations when they followed incidents involving the minors. For instance, respondent would often become defensive and attempt to minimize the identified risks. Respondent also struggled with responding appropriately to unforeseen circumstances. For instance, respondent responded to a shortened visit on K.S.'s first birthday by becoming argumentative and refusing to return the minors until police were called.

¶ 17    The witnesses further expressed concern with respondent exposing herself and the minors to unhealthy relationships. For instance, the father of S.H. and putative father of K.S. was a sex offender who, at one point, reportedly asked respondent to perform a sex act on his six-year-old child from another relationship.

¶ 18    Eventually, respondent, after it was discovered her payee of her social security benefits was not giving her the funds to which she was owed, became her own payee. She also obtained an apartment and her hygiene issues improved. Throughout the case, respondent expressed love and affection to the minors and provided them with toys and clothing. Respondent showed a desire to care for the minors, believing she could adequately do so. All of the witnesses believed respondent was not capable of providing the minors with the necessary care.

¶ 19                                    4. *Testimony of Respondent*

¶ 20         Respondent testified she lived in an apartment by herself, had been her own payee of her social security benefits for two years, had a support system of aunts and cousins who lived in the area, and had toys and a bed for the minors at her apartment. She also took her prescribed medication and attended doctor appointments. Respondent asserted she was no longer involved with Shane H. Respondent loved the minors and desired for them to be in her care.

¶ 21         Respondent explained she learned through the services she completed how to appropriately discipline the minors with timeouts and how to show them love and affection. She also learned how to recognize toxic elements in a relationship and to keep the minors away from unsafe people and to not allow them to be around people she just met. As to visitations, respondent asserted she provided the minors with toys, clothing, and food and played with them, read to them, watched cartoons with them, and showed them affection. The minors referred to her as "Mommy." Respondent asserted the caseworkers "[u]sually lie about how the visits go," specifically about her "not disciplining or giving them enough attention or talking to them, not keeping them safe." Respondent acknowledged she did not get along with some of her caseworkers but maintained she listened to their recommendations.

¶ 22         Respondent asserted her "mild disability isn't going to prevent me from taking care of my kids." Respondent believed she could provide the necessary care for the minors and indicated she would ask for help if she needed it. Respondent acknowledged S.H. had been diagnosed with health conditions. When asked about the specifics of those conditions, respondent testified, "Speech. I think it's his—I kind of forgot what they told me."

¶ 23                                    5. *Respondent's Letter*

¶ 24         In a nine-page handwritten letter to the trial court, respondent addressed, amongst

other things, the parenting capacity assessment. Respondent wrote, in part, the author of the assessment "lost her license awhile back and was able to get them back so I don't think that parenting assessment I did with her should be allowed to use in court."

¶ 25                                    6. *Unfitness Finding*

¶ 26          Based on this information, the trial court found respondent was an unfit parent as alleged in the State's amended petitions to terminate parental rights.

¶ 27                              C. Best-Interests Hearing

¶ 28          In December 2021, the trial court conducted a best-interests hearing. The court received for its consideration a best-interest report and two reports prepared by the Court Appointed Special Advocate and took judicial notice of the matters in the court file. The State presented testimony from a caseworker, a case supervisor, and the minors' foster mother. Respondent presented her own testimony. The following is gleaned from the evidence presented.

¶ 29          The minors had resided together with their foster parents, a relative foster placement, for the majority of their lives. The minors were bonded to their foster parents and viewed them as parental figures. The foster parents assured the minors' needs were being met. They provided S.H., who had special needs, with as much structure as possible, and assured he attended various medical appointments. The minors attended different activities in the community and were involved with and bonded to the foster parents' extended family. The foster parents expressed a willingness to provide the minors with permanency through adoption.

¶ 30          The minors attended visitations with respondent for several years. The State's witnesses believed the minors had a minimal bond to respondent, while respondent believed the minors were strongly bonded to her. During recent visitations, the minors would not stay at the visitations unless the foster mother was nearby, and they appeared ready to leave when the

visitations ended. Respondent had shown an inability to provide for the minors' needs. The State's witnesses believed respondent could not provide the minors with a safe environment, a belief with which respondent disagreed. Respondent loved the minors and desired for them to be in her care. In the event both minors could not be in her care, respondent desired for K.S. to be in her care or, alternatively, the foster parents only be given guardianship.

¶ 31 During the cross-examination of the case supervisor, respondent's counsel asked if the case supervisor "recall[ed] any concerns with the parenting capacity assessment, be it possibly that they were no longer license or anything of that sort." The case supervisor testified, "No. I believe—actually I would still use the same people that did that assessment." During the direct examination of respondent, respondent's counsel asked respondent about her belief of whether the author of the parenting capacity assessment had lost her license. While an objection was pending, respondent volunteered, "Yeah. That's what I was told." The objection was sustained.

¶ 32 Based on this information, the trial court found it would be in the minors' best interests to terminate respondent's parental rights. The court thereafter entered written orders terminating respondent's parental rights to each minor.

¶ 33 This appeal followed.

¶ 34 II. ANALYSIS

¶ 35 On appeal, respondent argues (1) her counsel provided ineffective assistance during her fitness hearing and (2) the trial court's best-interest findings are against the manifest weight of the evidence. The State disagrees with each of respondent's arguments.

¶ 36 A. Counsel's Performance

¶ 37 Respondent argues her counsel provided ineffective assistance during her fitness hearing. Specifically, respondent complains about her counsel's (1) failure to raise various

objections during the examinations of the State's witnesses, (2) agreement to the admission of State's Exhibit No. 2, and (3) failure to effectively challenge the testimony of the State's witnesses concerning her ability to parent.

¶ 38 In a proceeding to terminate parental rights, "parents are entitled to effective assistance of counsel." *In re M.F.*, 326 Ill. App. 3d 1110, 1119, 762 N.E.2d 701, 709 (2002). To establish a claim of ineffective assistance of counsel, a parent must show (1) counsel's performance fell below an objective standard of reasonableness and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *In re A.R.*, 295 Ill. App. 3d 527, 531, 693 N.E.2d 869, 873 (1998). "Failure to satisfy either prong precludes a finding of ineffective assistance of counsel." *In re A.P.-M.*, 2018 IL App (4th) 180208, ¶ 41, 110 N.E.3d 1126.

¶ 39 First, respondent complains about her counsel's failure to raise various objections during the examinations of the State's witnesses. Specifically, respondent (1) cites several pages from the transcripts which purportedly contain unobjected instances of leading questions, testimony lacking a sufficient foundation, and testimony that is "essentially hearsay or called for some form of speculation," and then (2) asserts those unobjected instances "undoubtedly had the cumulative effect of prejudicing [her] and making it almost impossible for the [trial] court to gauge the truth." Respondent has not established ineffective assistance. Respondent asks this court to identify questions and/or testimony on certain pages of the transcripts and then explain why a particular objection should have been made to those questions and/or testimony. That is not role of this court. See *In re H.B.*, 2022 IL App (2d) 210404, ¶ 41 ("[I]t is well settled this court is not a repository into which an appellant may foist the burden of argument and research." (Internal

quotation marks omitted.)). To the contrary, it was the responsibility of respondent to "set forth cogent arguments in support of *** her position." *Id.* Moreover, this court, upon a review of the entire record including the pages of the transcripts which purportedly contain objectionable questions and testimony, is not convinced the trial court could not adequately gauge the truth. See *In re Alexander R.*, 377 Ill. App. 3d 553, 557, 880 N.E.2d 1016, 1019 (2007) ("[U]nless the record reveals otherwise, the trial court is presumed to disregard incompetent evidence."). Respondent has not shown there is a reasonable probability the result of the proceeding would have been different with any objections by her counsel.

¶ 40          Next, respondent complains about her counsel's agreement to the admission of State's Exhibit No. 2. Specifically, respondent contends her counsel should not have agreed to the exhibit's admission because it precluded her from cross-examining Dr. Velez. Respondent again has not established ineffective assistance. Respondent suggests she could have cross-examined Dr. Velez concerning the fact her parenting capacity assessment did not include a formal assessment of adaptive behavioral functioning using the Vineland assessment tool, an assessment which, according to respondent, Dr. Breitmeyer indicated "was needed to make a definitive statement as to [her] ability to parent independently." Respondent fails to recognize, however, Dr. Breitmeyer indicated that such an assessment was needed only "to make *a more* definitive statement regarding [respondent] not being able to parent [S.H.] on an independent basis." (Emphasis added.) Respondent also suggests Dr. Velez could have been cross-examined with the fact the parenting capacity assessment contained two different ages of respondent. Respondent fails to recognize, however, that inconsistency was before the court regardless of whether Dr. Velez testified. Last, respondent suggests Dr. Velez could have been cross-examined concerning her licensing. The record shows respondent's concern with Dr. Velez's licensing stemmed from being "told" from

an unidentified person that Dr. Velez "lost her license awhile back and was able to get them back." Respondent's caseworker, on inquiry by respondent's counsel, indicated any licensing concerns were unwarranted. On the record presented, we find the possibility that any inquiry into Dr. Velez's licensing would have been favorable to respondent is entirely speculative. Respondent has not shown there is a reasonable probability the result of the proceeding would have been different with any cross-examination of Dr. Velez by her counsel.

¶ 41 Last, respondent complains about her counsel's failure to effectively challenge the testimony of the State's witnesses concerning her ability to parent. Specifically, respondent contends her counsel should have "explore[d]" each witness's knowledge and skill set and inquire as to "the adequacy" of the assistance each witness provided to her. Respondent again has not established ineffective assistance. While respondent identifies additional question that may have been asked of the State's witnesses, there is nothing in the record to suggest, even if counsel had asked those questions, the answers would have been favorable to respondent. Ultimately, the testimony from the State's witnesses presented a history of plaintiff's parenting which supported the opinion of Dr. Velez that respondent had multiple issues that prevented her from discharging her parental responsibilities. Respondent has not shown there is a reasonable probability the result of the proceeding would have been different with any further examination of the State's witnesses by her counsel.

¶ 42 In summary, respondent has not shown her counsel rendered ineffective assistance during her fitness hearing. We reach this decision considering plaintiff's complaints both individually and cumulatively.

¶ 43                                    B. Best-Interest Findings

¶ 44 Respondent argues the trial court's best-interest findings are against the manifest

weight of the evidence. Specifically, respondent contends it was not in (1) S.H.'s best interest to terminate parental rights because of her close relationship with him and (2) K.S.'s best interest to terminate parental rights because of her close relationship with her and because she had "the best prospect of eventually parenting" K.S. Respondent also contends guardianship rather than termination "would have been a more appropriate determination" in light of the placement of the minors with a relative and the likelihood she might have contact with the minors in the normal course of future family gatherings.

¶ 45    "The termination of parental rights is a two-step process under which the best interests of the child is considered only after a court finds the parent unfit." *In re E.B.*, 231 Ill. 2d 459, 472, 899 N.E.2d 218, 226 (2008). At the best-interest stage, the State must prove termination is in a child's best interests by a preponderance of the evidence. *In re D.T.*, 212 Ill. 2d 347, 367, 818 N.E.2d 1214, 1228 (2004); see also 705 ILCS 405/1-3(4.05) (West 2020) (setting forth several factors a trial court must consider when determining whether termination of parental rights would be in a child's best interest). On review, this court will not reverse a trial court's best-interest finding unless it is against the manifest weight of the evidence. *In re Anaya J.G.*, 403 Ill. App. 3d 875, 883, 932 N.E.2d 1192, 1199 (2010). A finding is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *Id.*

¶ 46    Here, the minors had resided with their foster parents for the majority of their lives. They were bonded to their foster parents as well as each other, and their needs were being met. The foster parents were willing to provide the minors with permanency through adoption. Conversely, respondent could not provide the minors with the necessary care, and recent visitations with the minors suggested any bonds the minors had with respondent were waning. Ultimately, respondent's interest in maintaining the parent-child relationships had to yield to the minors'

interests in a stable, loving home life. See *D.T.*, 212 Ill. 2d at 364. Based on the evidence presented, we find the trial court's best-interest findings are not against the manifest weight of the evidence.

¶ 47                                    III. CONCLUSION

¶ 48        We affirm the trial court's judgments.

¶ 49        Affirmed.