NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 200655-U

NO. 4-20-0655

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 11, 2021
Carla Bender
4th District Appellate
Court, IL

| | |
|---|---|
| *In re* N.M., a Minor | ) Appeal from the |
| | ) Circuit Court of |
| (The People of the State of Illinois, | ) Livingston County |
| Petitioner-Appellee, | ) No. 18JA6 |
| v. | ) |
| Alexander M., | ) Honorable |
| Respondent-Appellant). | ) Jennifer H. Bauknecht, |
| | ) Judge Presiding. |

PRESIDING JUSTICE KNECHT delivered the judgment of the court.
Justices Holder White and Steigmann concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The appellate court affirmed, concluding the trial court's findings respondent was an unfit parent and it was in the minor's best interest to terminate respondent's parental rights were not against the manifest weight of the evidence.

¶ 2   Respondent father, Alexander M., appeals from the trial court's judgment terminating his parental rights to his daughter, N.M. (born January 26, 2016). On appeal, respondent argues the trial court's findings he was an unfit parent and it was in the minor's best interest to terminate his parental rights are against the manifest weight of the evidence. We disagree and affirm.

¶ 3                          I. BACKGROUND

¶ 4   Respondent and Brittany S. are the minor's biological parents. During the proceedings below, Brittany S. consented to the minor being adopted by the minor's foster father, who was also Brittany S.'s father. Brittany S. is not a party to this appeal.

¶ 5                    A. Petition to Terminate Parental Rights

¶ 6           In February 2020, the State filed a petition to terminate respondent's parental rights. The State alleged respondent was an unfit parent as he (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare (750 ILCS 50/1(D)(b) (West 2018)); (2) was depraved (750 ILCS 50/1(D)(i) (West 2018)); (3) failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minor during certain nine-month periods following the minor's October 3, 2018, adjudication of neglected, namely October 3, 2018, to July 3, 2019, and May 11, 2019, to February 11, 2020 (750 ILCS 50/1(D)(m)(i) (West 2018)); and (4) failed to make reasonable progress toward the return of the minor to his care within certain nine-month periods following the adjudication of neglected, namely October 3, 2018, to July 3, 2019, and May 11, 2019, to February 11, 2020 (750 ILCS 50/1(D)(m)(ii) (West 2018)). The State further alleged it was in the minor's best interest to terminate respondent's parental rights and appoint the Department of Children and Family Services (DCFS) as guardian with the power to consent to adoption.

¶ 7                           B. Fitness Hearing

¶ 8           In October 2020, the trial court held a fitness hearing. The State presented testimony from a caseworker who had been assigned to the minor's case since January 2019. The State moved for the court to admit certified copies of three of respondent's prior felony convictions as well as three service plans, all of which the court granted over no objection. The State also moved for the court to take judicial notice of the prior orders entered in this case as well as Livingston County case No. 18-OP-49, which again the court granted over no objection. Respondent testified on his own behalf. The following is gleaned from the testimony and evidence presented.

¶ 9        Following the minor's January 2016 birth, respondent had, without any formal agreement, custody of the minor. Respondent testified he had custody because the minor's mother struggled with postpartum depression. Respondent further testified he cared for the minor while she was in his custody.

¶ 10        In April 2018, respondent was arrested and incarcerated on charges related to the possession and delivery of drugs. Respondent's parents, with whom respondent and the minor resided, were also arrested on drug charges. The arrests resulted in the minor being taken into protective custody and the State filing a petition for adjudication of wardship. According to the service plans, respondent's charges stemmed from him selling heroin to an undercover police officer from a vehicle in which the minor was present and unrestrained. The service plans also indicated the family home was searched and the police discovered (1) 131 bags of heroin in respondent's dresser, a dresser which also contained pull-ups and child clothing; (2) 10 exposed needles, 5 of which were loaded with heroin, on the floor; (3) a bowl of cocaine in the kitchen with straws coming from it; and (4) heroin hidden within clothing of respondent's parents.

¶ 11        At some point thereafter, respondent was released on bond. During his release, respondent completed inpatient substance abuse treatment. It was recommended respondent continue with outpatient substance abuse treatment. Respondent did not complete the outpatient treatment. According to respondent, he did not complete the treatment because he reached a plea agreement with the State in his criminal cases. The caseworker testified respondent was reincarcerated for noncompliance with the conditions of his bond.

¶ 12        In October 2018, the trial court, at a hearing where respondent was present, found the minor to be neglected based, in part, on respondent's inability to properly parent because of

his substance abuse issues. In December 2018, the court, at another hearing where respondent was present, adjudicated the minor a ward of the court and placed guardianship and custody with DCFS.

¶ 13        In March 2019, respondent pleaded guilty to felony drug charges and was sentenced to a total of five years in prison. The record shows respondent has three felony drug convictions. Respondent was transferred to Centralia Correctional Center (Centralia) to serve his prison sentences. According to respondent, he spoke with a counselor after arriving at Centralia and explained the situation with the minor and asked if he could sign up for any programs offered. He was then enrolled, or signed up to be enrolled, in various programs related to parenting, anger management, domestic violence, and general education. He also was screened for a substance abuse program. While at Centralia, respondent began some of the programs, obtained employment within the prison, and was baptized.

¶ 14        During the summer of 2019, the minor's caseworker met with respondent at Centralia. The caseworker noted she was unable to meet with respondent prior because respondent had not listed her name on a prison visitor list. During the meeting, respondent inquired generally about the minor's welfare. The caseworker reviewed with respondent the services which he was recommended to complete, including substance abuse, domestic violence, and parenting services. The caseworker encouraged respondent to participate in services offered by the prison but informed him he would have to complete the recommended services once he was released from prison. Respondent reported to the caseworker he was attempting, or going to attempt, to work on his services while imprisoned.

¶ 15        In February 2020, respondent left Centralia for court matters and was then

quarantined at Pontiac Correctional Center (Pontiac) due to the coronavirus pandemic. As a result, respondent was unable to complete programs at Centralia. At the time of the fitness hearing, respondent was still at Pontiac. He expected to be released from prison in February 2021.

¶ 16 Respondent's last contact with the minor was in April 2018. After the minor was taken into protective custody, the minor's foster parents, the minor's maternal grandparents, received an order of protection which reportedly prevented respondent from having any contact with the foster parents, the minor's mother, or the minor. Respondent testified about filing a motion to vacate the order of protection after he learned about the foster mother's death. Ultimately, another order of protection was entered.

¶ 17 The minor's caseworker described respondent as "[n]ot very cooperative" with DCFS. The caseworker testified respondent, despite being provided with her contact information, never reached out by phone or letter to inquire about the minor's welfare. Respondent testified he believed he once called the caseworker and left her a message asking her to contact his parents if she needed anything from him. Respondent further testified he had his parents contact the caseworker on numerous occasions because it was easier for him to call his parents.

¶ 18 At the time of the fitness hearing, respondent had not completed any of the recommended services. Respondent testified he would have re-enrolled in programs had he been allowed to return to Centralia. Respondent believed he had changed as a person. He testified he had no disciplinary issues in prison, tested negative on two prison drug tests, and had not used any drugs in prison. Respondent also testified he had employment available upon his release and planned on initially living with family members and then securing a separate residence for him and the minor. Respondent planned on enrolling in the necessary services upon his release.

¶ 19    Based on this information, the trial court found respondent was an unfit parent for all the reasons alleged in the State's petition to terminate parental rights. In the oral pronouncement of its decision, the court stated, in part, as follows:

"And the bottom line is there's nothing in that order of protection that would have prohibited you from reaching out to the caseworker and maintain contact with the caseworker concerning the well[-]being of [the minor]. In fact, the communication with the caseworker was extremely minimal since [January of 2019].

So you have had one communication with her for almost two years, just a few months shy of two years; and the order of protection really would not have prohibited you in any way, shape or form from having communication with the caseworker to discuss with her how [the minor] was doing, what [the minor's] needs may have been. And when the grandmother passed away, again, you could have communicated with the caseworker concerning where [the minor] was, who was taking care of [the minor], and also could have discussed with the caseworker any potential ability to speak *** or *** to send letters or communicate with [the minor].

So I'm hearing a lot of excuses for why you have not been able to do much up until this point, all of which really fall on you. You're in [prison] due to your own actions. There's nothing in the order of protection that prohibited you from following up with the

caseworker."

¶ 20                                   C. Best-Interest Hearing

¶ 21        In November 2020, the trial court held a best-interest hearing. The court received a best-interest report. The State presented testimony from the caseworker who had been assigned to the minor's case since January 2019. The State moved for the court to take judicial notice of the evidence entered at the fitness hearing, which the court granted over no objection. Respondent testified on his own behalf and presented testimony from his father and his 18-year-old daughter. The following is gleaned from the evidence presented.

¶ 22        The minor, a healthy child who was almost five years old at the time of the best-interest hearing, had been placed with her foster father, who was also her maternal grandfather, since she was two years old. The minor referred to her placement as her home. Her interests and needs were being met by her foster father. She appeared happy, comfortable, and loved. She was bonded to her foster father. The minor had a relationship with an adult daughter of the foster father who also lived in the home. The minor is included in family birthdays and holidays. The foster father had become a licensed foster parent for the purpose of caring for the minor. The foster father was willing to provide the minor with permanency through adoption. The minor had friends at school and day care, and she built relationships with teachers and neighbors. The minor's teachers reported the minor spoke positively about her foster father and his adult daughter. The caseworker found, given the loss of the foster mother the year before, the minor's cheerfulness and positivity was a testament to the time, love, and care invested by her foster father. The minor's caseworker had no concerns with the minor's placement.

¶ 23        The minor had not seen or communicated with respondent since she was taken into

protective custody in April 2018. The minor's caseworker had not heard from respondent in more than a year. The caseworker sent respondent letters, to which he did not respond. The caseworker was not aware of any bond between respondent and the minor. The minor's teachers reported not hearing the minor speak about respondent. Respondent was serving a five-year prison sentence. It was expected he would be released from prison in February 2021. At that point, he would have to begin completing the recommended services.

¶ 24 Prior to being taken into protective custody, the minor lived with respondent and respondent's parents. Respondent, with assistance from his parents, cared for the minor. Respondent testified he and the minor were bonded. Respondent further testified he had three other children, all who lived with their respective mothers, who were bonded to the minor. Respondent's 18-year-old daughter confirmed the bond she had with the minor, noting she visited the minor on weekends prior to respondent's incarceration.

¶ 25 Respondent and respondent's father were asked about the events which led to the minor being taken into protective custody. Respondent acknowledged pleading guilty to drug charges and to selling drugs from his vehicle. Respondent denied the minor was present in his vehicle when he sold the drugs. When asked if 131 bags of heroin were discovered during the search of the family home, respondent testified, "Allegedly." When further asked if bags of heroin were recovered from the room in which he resided with the minor, respondent again responded, "Allegedly." Respondent's father acknowledged pleading guilty to possession of a controlled substance. He denied having heroin on his person and testified he pleaded guilty based upon the advice of his attorney. Respondent's father had not completed any substance abuse treatment.

¶ 26 Respondent testified about his plans upon his release from prison. He planned on

completing all recommended services, beginning a job he had secured, and fostering the relationship he and his other children had with the minor. Respondent hoped to provide the minor with opportunities to learn Spanish and experience multiple cultures. He planned on residing with his parents but was willing to move to where the minor's life had been established. He also planned on his other children living with him, the minor, and his parents. Respondent's 18-year-old daughter described respondent as her "best friend." She noted she lived with respondent until she was three or four years old.

¶ 27    The agency assigned to monitor the minor's well-being believed it would be in the minor's best interest to terminate respondent's parental rights.

¶ 28    Based on this information, the trial court, after considering the statutory best-interest factors, found it would be in the minor's best interest to terminate respondent's parental rights. The court entered a written order terminating respondent's parental rights.

¶ 29    This appeal followed.

¶ 30                              II. ANALYSIS

¶ 31    On appeal, respondent argues the trial court's findings he was an unfit parent and it was in the minor's best interest to terminate his parental rights are against the manifest weight of the evidence. The State disagrees.

¶ 32                           A. Unfitness Finding

¶ 33    Respondent asserts the trial court's finding he was an unfit parent is against the manifest weight of the evidence.

¶ 34    In a proceeding to terminate parental rights, the State must prove parental unfitness by clear and convincing evidence. *In re N.G.*, 2018 IL 121939, ¶ 28, 115 N.E.3d 102. A trial

court's finding of parental unfitness will not be disturbed on appeal unless it is against the manifest weight of the evidence. *Id.* ¶ 29. A finding is against the manifest weight of the evidence "only where the opposite conclusion is clearly apparent." *Id.*

¶ 35    The trial court found respondent was an unfit parent as defined in section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2018)). Section 1(D)(b) states a parent will be considered an "unfit person" if he or she fails "to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." In determining whether a parent showed reasonable concern, interest, or responsibility as to a child's welfare, the court must examine "the parent's conduct concerning the child in the context of the circumstances in which that conduct occurred." *In re Adoption of Syck*, 138 Ill. 2d 255, 278, 562 N.E.2d 174, 185 (1990).

¶ 36    Respondent contends his lack of communication with the minor cannot support an unfitness finding based on the failure to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare where his lack of communication resulted from the orders of protection entered against him. As emphasized by the trial court, nothing in the orders of protection prevented respondent from communicating with the minor's caseworker, the individual assigned to monitor the welfare of the minor, about the minor's welfare. Respondent did not even inquire about the minor's welfare after learning the minor's foster mother, who was also the minor's maternal grandmother, passed away while the minor was in her care. Given the evidence presented, we find the trial court's unfitness finding based on respondent's failure to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare is not against the manifest weight of the evidence.

¶ 37    As only one ground for a finding of unfitness is necessary to uphold the trial court's

judgment, we need not review the other grounds for the court's unfitness finding. *In re Z.M.*, 2019 IL App (3d) 180424, ¶ 70, 131 N.E.3d 1122.

¶ 38                                B. Best-Interest Finding

¶ 39        Respondent asserts the trial court's finding it was in the minor's best interest to terminate his parental rights is against the manifest weight of the evidence.

¶ 40        In a proceeding to terminate parental rights, the State must prove termination is in the child's best interests by a preponderance of the evidence. *In re D.T.*, 212 Ill. 2d 347, 367, 818 N.E.2d 1214, 1228 (2004). When considering whether termination of parental rights would be in a child's best interest, the trial court must consider several statutory factors within the context of the child's age and developmental needs. See 705 ILCS 405/1-3(4.05) (West 2018).

¶ 41        This court will not reverse a trial court's finding termination of parental rights is in a child's best interests unless it is against the manifest weight of the evidence. *In re Anaya J.G.*, 403 Ill. App. 3d 875, 883, 932 N.E.2d 1192, 1199 (2010). Again, a finding is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *Id.*

¶ 42        Respondent contends the trial court's best-interest finding is against the manifest weight of the evidence given his desire to have the minor returned to his care and the relationship he and his family members built with the minor during the first two years of her life. While respondent's desire to have the minor returned to his care and the alleged relationship the minor had with respondent and his family members were certainly relevant, the court had to weigh the evidence supporting these interests and then balance them with the minor's needs for permanency and continuity. Given the evidence showing the minor's current placement provided her with the permanency and continuity which she needed, we find the trial court's finding it was in the minor's

best interest to terminate respondent's parental rights is not against the manifest weight of the evidence.

¶ 43                                III. CONCLUSION

¶ 44          We affirm the trial court's judgment.

¶ 45          Affirmed.