NOTICE
Decision filed 06/11/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 210002-U

NO. 5-21-0002

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* MARIAH W., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Christian County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 17-JA-23 |
| | ) | |
| Curtis S., | ) | Honorable |
| | ) | Douglas L. Jarman, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Presiding Justice Boie and Justice Vaughan concurred in the judgment.

**ORDER**

¶ 1　*Held*: The judgment of the circuit court of Christian County that terminated the respondent's parental rights is affirmed because: (1) there was no requirement that a permanency hearing report, or a new service plan, be filed and served, in the manner requested on appeal by the respondent, prior to changing the permanency goal in this case, (2) the circuit court did not err when it denied the respondent's motion to continue the fitness hearing, and proceeded without his presence at that hearing, and (3) the circuit court's findings regarding the respondent's fitness, and the minor child's best interest, are not against the manifest weight of the evidence.

¶ 2　The respondent, Curtis S., appeals the judgment of the circuit court of Christian County that found the respondent unfit as a parent and found it in the best interest of the respondent's biological minor child, Mariah W., to terminate the respondent's parental rights. For the following reasons, we affirm.

1

¶ 3                                    BACKGROUND

¶ 4    This case began with the filing, on March 21, 2017, of, *inter alia*, a petition for adjudication of wardship, following the removal of Mariah, who was born in early October 2006, from the care of her biological mother, due to allegations of neglect due to an unsafe environment. Because Mariah's biological mother is not a party to this appeal, and because the respondent did not reside in the allegedly unsafe environment with Mariah and Mariah's biological mother, we need not discuss the neglect allegations in detail. Counsel was thereafter appointed to represent the respondent, who was at that time incarcerated in the Illinois Department of Corrections (IDOC). Mariah was placed for foster care purposes with the respondent's sister, Mariah's paternal aunt. A service plan was initiated for the respondent to complete, to the extent that he was able to work on the service plan while incarcerated. Later in 2017, the respondent was released from the custody of IDOC and was placed on mandatory supervised release. His service plan continued at that time. He was briefly returned to the custody of IDOC, for approximately two months, in 2018, evidently as the result of a violation of the terms of his release.

¶ 5    From 2017 to 2020, a series of dispositional hearings and permanency review hearings were held, without the testimony of witnesses, and with the continuing goal of "return home within 12 months." Progress reports were filed with the court in conjunction with these hearings and are part of the record on appeal. Of relevance to this appeal, on July 15, 2020, a hearing was held in which the trial judge noted that the goal had changed from "return home" to "termination of parental rights," and that accordingly "a goal change hearing" would be held on August 31, 2020.

¶ 6    On August 31, 2020, the goal change hearing was held, over the objection of the respondent, who did not wish for the goal to be changed. Chris Brizendine testified that she was a caseworker employed by Kemmerer Village and was assigned, as a designee of the Illinois Department of Children and Family Services (DCFS), to Mariah's case. She testified that she had been involved with the case since its inception in March 2017, and that Mariah had been placed in the care of Mariah's paternal aunt since that time. She testified that Mariah was doing "exceptionally well" in that setting. With regard to the respondent, Brizendine testified that DCFS had provided the respondent with a service plan and with the support necessary to comply with the plan. She testified that "in the beginning," the respondent's visits with Mariah "went very well," although at "times he discussed inappropriate things, like that adults should only talk to adults about." She added that it seemed "like the visits are more like they are friends rather than parent-child," and that the respondent "promises her things that don't happen."

¶ 7    Brizendine testified that the respondent sometimes told Mariah about problems the respondent was having with his girlfriend. She testified that she told the respondent not to discuss these things with Mariah, and that he would temporarily stop, but then at later visits he would begin to discuss them again. She described the respondent's visitation schedule with Mariah during the approximately 3.5 years Mariah had been in foster care as "fairly consistent" in the beginning, but then "more inconsistent," with the last visit having taken place in March 2020, due to an order of protection being entered against him at that time. When asked if the respondent had completed his service plan, Brizendine testified that the respondent had "not completed any services." With regard to the respondent's progress toward meeting his goals, she testified that the respondent "would start, maybe make an appointment and then not go back, or if I sent him for a drug screen, he always had an excuse that he didn't have an ID. The times he

3

did do a drug screen we took him so that they would use our ID to identify him." She added that she had not asked the respondent to do a drug screen in a while, because of the respondent's "threatening behavior" toward her and toward other caseworkers.

¶ 8 Brizendine testified that although the pandemic had halted in-person visits, the respondent had not been offered video visits with Mariah either, because of the respondent's "erratic behavior and the way he talked about staff and other people." She added that, "it was just confusing to Mariah, and she, after the order of protection came into effect, she did not want to visit with him, video or otherwise." When asked to describe the respondent's erratic behavior, she testified, "It's just in general how he acts. He talks about things that make no sense, and when I would get messages and things, they didn't make any sense." She added that Mariah "just didn't want to have anything to do with him." She testified that "[f]or the most part," she had been able to stay in contact with the respondent, and that he would "answer messages," but that despite this, he had not completed his service plan.

¶ 9 On cross-examination by the respondent's counsel, Brizendine reiterated that Mariah did not wish to visit with the respondent, which was why video visits were not offered to the respondent. She testified that DCFS gave the respondent a referral for mental health services, but conceded that she never requested a psychiatric evaluation of the respondent, despite his allegedly erratic behavior. She testified that prior to March 2020, the respondent "would show up for" his visits with Mariah "50% to 75% of the time." When asked what services the respondent was still required to complete pursuant to his service plan, she testified that he needed to complete domestic violence treatment, a mental health assessment, and "drug counseling again, drug treatment." She testified that the respondent began his domestic violence classes, but stopped going. When asked if he stopped going because of the pandemic, she testified, "No, I

4

think he stopped going before." She did not know if domestic violence classes were still available during the pandemic. She testified that she had not spoken to the respondent "recently" about attending domestic violence classes. She testified that she "[p]robably" discussed the classes with the respondent in July 2020, and that she went over his service plan with him in March 2020, including the requirement to attend domestic violence classes. She could not recall the last time she had asked the respondent to do a drug screen, but agreed that the results from his probation-based drug screens were available to her if she requested them. She testified that the one probation-based result that had been shared with her was a positive drug test. She agreed that test might have been in December 2019, but testified that she believed she had sent him for at least one test subsequent to then, but was not sure. She testified that the respondent did complete one mental health assessment, but that the respondent "never went back." She testified that she believed the respondent had mental health issues, and that "if he participated in the proper services he could, his mental health would get better."

¶ 10    On cross-examination by the court-appointed guardian *ad litem* (GAL), Brizendine testified that the services required under the respondent's service plan were that the respondent "needed a mental health assessment. He needed a substance abuse treatment and to have clean drops. He needed to provide a safe place for his daughter to live and the domestic violence was a real big one because of his past." When asked if he had completed any of these services, she testified, "No, he has not." When asked if Mariah was a protected party under the order of protection, she answered that Mariah was.

¶ 11    The respondent testified as well. He testified that he was presently employed, that he had completed his domestic violence assessment, and that he had "a couple more classes" to attend before he would receive his certificate for his domestic violence classes. When asked why he had

5

not yet completed the classes, he testified that the classes were canceled because of the pandemic. He clarified that the classes had begun again, but that he had not finished them yet, although he was still attending. He testified that he had completed his mental health assessment, but that he had not completed mental health courses because he was told by his insurance company that the courses were not covered. When asked if he believed he had completed the required mental health courses, the respondent testified, "Um, kind of through a certain extent. I been told I still need it by three different doctors." He testified that his most recent probation-based drug test result had been negative, and that he believed he had been compliant with his probation requirements. When asked if he had been contacting Brizendine when she requested that he call her, the respondent testified, "To the best of my knowledge, I could." He testified that he had not been participating in visits with Mariah since the order of protection was entered against him, although he participated in visits with her prior to that.

¶ 12    On cross-examination by the State, the respondent testified that he was on "parole" for the offense of domestic battery, and believed that he would get off parole in the next six or seven months. Following the respondent's testimony, the parties presented argument as to whether the goal for Mariah should be changed to substitute care pending the termination of parental rights. The State argued that the respondent had not completed his service plan, despite the fact that he had adequate opportunities to do so, and that "this is a situation that has been going on for well over three years." Counsel for the respondent argued that DCFS had not provided the respondent with the services he required, largely because of the pandemic, and had not requested drug tests or a psychiatric evaluation, and not set up video visits between the respondent and Mariah. She added that she believed the respondent was making reasonable progress toward reunification with Mariah. The GAL argued that "[t]he bottom line here is [Mariah needs] permanency. All

6

the parties have had 40 months now to get this stuff done, and it's not done." He added that, "the bottom line is this probably should have been done a long time ago," and stated that he would "ask the Court to adopt recommendation of Kemmerer Village and that would be substitute care pending termination of parental rights."

¶ 13   The judge, referring to the reports in the record, stated that the respondent failed to appear for drug screens in July and August of 2019, tested "positive for amphetamines, methamphetamines" in September 2019, and tested positive for cocaine in December 2019. The respondent was asked to test again in March 2020 but "was a no-show" for that test. The judge then stated that he was going to adopt the goal of substitute care pending termination. He set the case for a first stage termination hearing on October 22, 2020, at 1:15 p.m., for an in-person hearing. He repeated the date and time—October 22, 2020, at 1:15 p.m.—two additional times, then admonished the respondent to continue to cooperate with DCFS and his service plan, or that the respondent "could risk losing parental rights." The respondent replied, "Yes, sir."

¶ 14   On October 22, 2020—approximately 3 weeks after Mariah turned 14 years old and over 3.5 years since the inception of this case—the first stage termination hearing was held. Counsel for the respondent noted that the respondent was not present. When asked if she had had contact with him, she stated, "I have not had contact with him since the last hearing. He had moved pursuant to an [order of protection]. I did not have an updated address for him recently. I don't have a working phone number for him. I will state that he has been at almost every court hearing since I represented him other than today." The judge noted that the respondent attended the last hearing and was "given today's date and time." Counsel thereafter stated, "I will say there was some confusion as to whether or not this was going to be held in person or by Zoom, so my client could be trying to get on or have been anticipating this be done through Zoom. I would ask

7

for a continuance." The judge replied, "It was set for 1:15 and it's 1:23 now. Before I came into the courtroom, I checked on Zoom and there was no one there." He then asked the clerk to pull up the Zoom meeting, which the clerk did. The clerk indicated on the record that there was no one present in the waiting room on the Zoom call. The judge asked counsel for the State if he wished to be heard on the respondent's motion to continue, and counsel for the State objected to the continuance, noting that the State had its witness present and was ready to proceed. The judge reiterated that the respondent had been given notice of the date and time of the hearing and had failed to appear. He denied the motion to continue.

¶ 15    Brizendine was the only witness to testify at the hearing. Her testimony was for the most part consistent with her testimony, described above, at the August 31, 2020, goal change hearing. When asked why the respondent required domestic violence classes, she testified that he "had been in prison so many times for assaults, we felt the domestic violence [treatment] was necessary." When asked if the respondent cooperated with his service plan, she testified, "I would have to say no. He never really got too involved in any of the services." She testified that he did not complete drug treatment, that he missed required drug screens, and that she believed he "probably" failed more than one drug screen that he did complete, noting a positive test for cocaine in December 2019, and positive tests for amphetamine and methamphetamine. She testified that he did not complete mental health treatment, and that although he did get his initial mental health assessment, thereafter "he never kept his appointments." Brizendine testified that although the respondent "did go" to some domestic violence treatment classes, "he didn't complete" the classes.

¶ 16    With regard to the respondent's visits with Mariah, Brizendine reiterated that although some of the visits went well, "he would make promises to Mariah that he was going to get her

8

this or going to do that and he would never follow through and she got very frustrated at that." She added that "some of the visits towards the latter part of last year, we had to stop. We had to send two people to do visits because his behavior was so erratic and finally Mariah said she didn't want to see him anymore." When asked to elaborate on how the respondent's behavior was erratic, Brizendine testified that the respondent "would ask the case aids to take him different places or meet with different people and we were not allowed to do that. If they went to McDonald's, he—there was one time when he told her to order whatever she wanted to eat and then he didn't have any money. There was a time when he met with some other people at McDonald's when he was supposed to be visiting her." She testified, with regard to the order of protection entered against the respondent, that it resulted from the respondent's threats to kill Mariah's foster mother, the respondent's sister. Brizendine testified that the respondent had also threatened to kill Brizendine, the judge, and everyone else involved in the case. With regard to whether the pandemic interfered with the respondent's visitation with Mariah, she testified that "the [orders of protection] were in effect by the end of March or the first part of April [2020,] and Mariah refused to see him or talk to him." She testified that the respondent was given multiple opportunities to complete his service plan, but failed to do so. When asked, she testified that based upon her training and experience, she believed it was in the best interest of Mariah to terminate the respondent's parental rights.

¶ 17 On cross-examination by counsel for the respondent, Brizendine testified that the respondent had the opportunity to complete his service plans once he was released from the custody of IDOC in 2018. She testified that the respondent "would've had time before [the pandemic] ever started to participate in most of" his domestic violence classes, and that she did not know if he was still attending classes at the start of the pandemic. With regard to his visits

with Mariah, she testified that his attendance was "kind of sporadic. He did attend most of them. Sometimes he would be very late, sometimes he wouldn't show up." She testified that she did not believe the respondent's mental health assessment was impacted by the pandemic either. When asked about the respondent's transportation issues, she testified, "We always provided that for visits. We would pick him up, take him to the visit, pick Mariah up. We offered rides to drug treatment or to the drug drops, and I know he had a bus pass so he used that for things." She testified that they also took him to court appearances "a few times," and that she had messaged the respondent to remind him of the October 22, 2020, hearing. She could not remember exactly when she messaged him, but thought it was "last week."

¶ 18    Following Brizendine's testimony, the parties offered argument. Prior to the State's argument, the judge stated, "In your petition, you're alleging that [the respondent] failed to make reasonable efforts within a nine month period. I will need to know specifically what nine month period you're referring to." Counsel for the State responded, "The time period we would be using for today's purposes would be just that calendar year October 2019 until October of 2020." The respondent did not object to this statement. Thereafter, the judge stated that he found by clear and convincing evidence that, *inter alia*, the respondent "did not make reasonable efforts in the period October 2019 to October 2020," did not complete his service plan, and "failed to maintain a reasonable degree in interest concerning responsibility." He therefore set the matter for an in-person—with the option of participating by Zoom—best interest hearing on December 1, 2020, at 2:30 p.m.

¶ 19    The first witness to testify at the December 1, 2020, hearing was Brizendine. She testified that Mariah was provided adequate food and shelter, healthcare, and clothing in her foster home, where she had lived since March 2017. She testified that Mariah has a good relationship with her

10

foster mother, calls her "Mom," is doing well in school and socially, and is well-adjusted in general. She testified that Mariah has told her "many times" that she wants to stay with her foster mother. She testified that she believed keeping Mariah with her foster mother was the least disruptive way to care for Mariah, because Mariah was "flourishing" under her foster mother's care. With regard to school, Brizendine testified, "Mariah is doing excellent. She's had perfect attendance. She has straight As, A pluses. She has been student of the month. She loves art. She's been on the remote learning and she is doing well." She contrasted that with Mariah's performance when under the care of her biological mother, during which Mariah was "at least a year, year and a half behind" academically. She testified that Mariah's home with her foster mother was stable, and that Mariah was able to attend therapy, which was helping her to "speak[ ] up for herself a lot better." She testified that Mariah's foster mother wished to adopt Mariah. She testified that based upon her training and experience, she did not believe the respondent could care for Mariah as Mariah's foster mother has, even with regard to "simple" matters like providing adequate food and shelter. She testified that she believed it was in Mariah's best interest to be adopted by her foster mother. On cross-examination by counsel for the respondent, Brizendine testified again that after the respondent's release from IDOC, the respondent's early visits with Mariah were not problematic, but that later visits "didn't go so well," and that visits eventually ceased.

¶ 20    Mariah's foster mother, Katrina Robinson, testified next, via Zoom. She testified that she was ready, willing, and able to adopt Mariah, if the court allowed her to do so. Her testimony with regard to Mariah's adjustment to living in her home was consistent with the testimony of Brizendine. She testified that she was not currently working outside the home, which eliminated the need for day care and babysitters, and allowed her to help Mariah and her other children with

11

their remote schooling. She testified that she loved Mariah and expressed affection for Mariah, and that Mariah loved her and expressed affection for her.

¶ 21    The respondent testified by Zoom as well. He testified that he was 41 years old, currently employed by Faith Coalition, and residing in Springfield. When asked when he last saw Mariah, he testified that he ran into her at a Dollar General store, but that his last supervised visit was prior to the pandemic. He testified that he did not believe it was in Mariah's best interest for her to not have contact with him. When asked if he would be agreeable to a guardianship with his sister, he replied, "If it's a requirement to seeing my child, because my daughter needs to speak to me." On cross-examination, the respondent testified that he thought he would be "off" parole soon, but could not give a projected date. He testified with regard to his prior convictions and sentences to IDOC. On redirect examination, he testified that he was currently compliant with the terms of his parole.

¶ 22    Following the respondent's testimony, and with the consent of the respondent, counsel for the respondent summarized the respondent's position as being that he did not "have an objection to Mariah living with [his] sister," but that he "just want[ed] to be able to continue having contact with" Mariah. Thereafter, the parties presented their arguments, with the GAL noting that he had spoken to Mariah the night before the hearing, and that Mariah still wished to be adopted by her foster mother. The judge then stated "that permanency for [Mariah] is what we're concerned with here. It's been going on for three and a half years, over three and a half years. That's been more than enough time and some additional time is not going to help the situation." He stated that he found by clear and convincing evidence that it was in the best interest of Mariah for the respondent's parental rights to be terminated, and for the goal for Mariah to be changed to adoption.

12

¶ 23    Two days later, on December 3, 2020, the judge entered a written order that terminated the respondent's parental rights. Without ever referencing the period of October 2019 to October 2020, the order stated, *inter alia*, that the State had prevailed on its petition alleging that the respondent was "unfit due to failure to make reasonable efforts to correct the conditions that were the basis for the removal of" Mariah "and failure to make reasonable progress toward the return of the minor within the initial 9 months of the adjudication of neglect." This appeal followed.

¶ 24                                    ANALYSIS

¶ 25    On appeal, the respondent asks this court to determine whether: (1) "the goal change was appropriate on August 31, 2020, when no updated service plan had been filed and served as required in statute," (2) the circuit court erred when it denied the respondent's motion to continue the fitness hearing, and proceeded without his presence at that hearing, and (3) the circuit court's findings regarding the respondent's fitness as a parent, and the minor child's best interest, are against the manifest weight of the evidence. With regard to his fitness and best interest arguments, the respondent contends that the pandemic prevented the respondent from making reasonable efforts to complete his service plan, and the respondent asks this court to consider all of his arguments on appeal with the disruptions caused by the pandemic in mind. The respondent also points out that the judge's December 3, 2020, order specifically stated that one of the grounds for the respondent's unfitness was that the respondent failed to make reasonable progress "within the initial 9 months of the adjudication of neglect," and posits that the only evidence presented about that 9-month period was that the respondent was making adequate progress at that time.

¶ 26 The State responds to the respondent's first argument by pointing out that although the statutory section cited by the respondent for his first point requires that the caseworker must provide all parties to a permanency hearing "a copy of the most recent service plan prepared within the prior 6 months at least 14 days in advance of the hearing" (705 ILCS 405/2-28(2) (West 2020)), that provision was complied with in this case because the most recent service plan prior to the July 15, 2020, and August 31, 2020, hearings was filed on April 7, 2020, which was well within the statutory time frame. The State further points out that the filing to which the respondent actually appears to object on appeal—the July 10, 2020, permanency hearing report filed by the State—is not governed by the statutory section in question, which by its plain language, quoted above, governs the timing of the filing only of a service plan, not a permanency hearing report. The State contends that because the service plan was filed as required, and because there was no requirement governing the filing of the permanency hearing report, there was no error in this case.

¶ 27 With regard to the respondent's second point, the State contends that the judge in this case did not err when he denied counsel's request to continue, because the judge specifically noted, correctly, that he had provided the respondent with notice of the date and time of the hearing, and because the judge prudently checked Zoom both before and during the hearing to make certain that the respondent—who may have been confused about whether the hearing was in person or on Zoom—was not attempting to attend the hearing via Zoom. The State also points out that during the hearing, Brizendine's testimony revealed that she had messaged the respondent to remind him of the October 22, 2020, hearing, and yet the respondent had still failed to appear. With regard to the respondent's fitness and best interest arguments, the State contends that the reports found in the record on appeal, as well as Brizendine's testimony,

14

provide adequate evidence that the respondent was not a fit parent and that it was in the best interest of Mariah to terminate the respondent's parental rights. The State notes that although the judge's December 3, 2020, order made reference to the initial nine months after the adjudication of neglect, the petition to terminate parental rights referred to *any* nine month period after the adjudication of neglect.

¶ 28    In his reply brief, the respondent abandons the argument that the caseworker was required to file the permanency hearing report within the time frame specified for services plans in section 2-28(2) of the Juvenile Court Act of 1987 (705 ILCS 405/2-28(2) (West 2020)) and instead argues for the first time on appeal "that the agency failed to file timely and appropriate service plans as required by statute." The respondent does not contend that the April 7, 2020, service plan was not timely filed with regard to the August 31, 2020, hearing—in fact, the respondent concedes that it would remain timely for approximately two weeks after that hearing. Instead, for the first time the respondent appears to take issue with a service plan filed in 2018, and for the first time claims that there is no evidence that the respondent met with caseworkers to discuss his service plan. As for fitness, the respondent contends that the record in this case shows "an established history of [the respondent] completing portions of his service plan and attempting to make reasonable efforts."

¶ 29    With regard to the first issue raised on appeal by the respondent in his opening brief, there is no merit to the respondent's claim that section 2-28(2) (*id.*) required caseworkers to file the permanency hearing report at the time and in the manner desired by the respondent, which is probably why the respondent did not pursue this argument in his reply brief. As the State aptly points out, the statute requires that the caseworker must provide all parties to a permanency hearing "a copy of the most recent service plan prepared within the prior 6 months at least 14

15

days in advance of the hearing" (*id.*), and that provision was complied with in this case because the most recent service plan prior to the July 15, 2020, and August 31, 2020, hearings was filed on April 7, 2020, which was well within the statutory time frame. The State is also correct that the filing to which the respondent actually appears to object in his opening brief on appeal—the July 10, 2020, permanency hearing report filed by the State—is not governed by the statutory section in question, which by its plain language, quoted above, governs the timing of the filing only of a service plan, not a permanency hearing report. We agree with the State that because the service plan was filed as required by statute, and because there was no requirement within the statutory section in question that governed the filing of the permanency hearing report, there was no error in this case. With regard to the issues raised by the respondent for the first time in his reply brief, those issues are forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (argument must contain the contentions of the appellant, the reasons therefor, and the citation of authorities; points not argued in an opening brief are forfeited and shall not be raised in the reply brief, in oral argument, or in a petition for a rehearing). Moreover, the respondent has provided no cogent argument for why his service plans were not "appropriate" in terms of what they required the respondent to do in order to preserve his parental rights with Mariah.

¶ 30     With regard to the second issue raised on appeal by the respondent, although a parent has the right to be present at a hearing on a petition to terminate parental rights, that parent's presence is not mandatory, and the circuit court is not obligated, before proceeding, to wait until a parent chooses to appear. *In re C.L.T.*, 302 Ill. App. 3d 770, 778 (1999). Moreover, a parent does not have an absolute right to a continuance in a termination proceeding, and the circuit court does not deprive a parent of the right to due process by conducting a hearing in the absence of the parent. *In re S.W.*, 2015 IL App (3d) 140981, ¶¶ 31, 34. The decision whether to grant or

16

deny a motion to continue in a termination proceeding rests within the sound discretion of the circuit court. *In re C.L.T.*, 302 Ill. App. 3d at 779. We will not disturb that decision unless we find manifest abuse or palpable injustice in the court's decision. *In re S.W.*, 2015 IL App (3d) 140981, ¶ 31.

¶ 31     In this case, we agree with the State that there was no manifest abuse or palpable injustice in the judge's decision to deny the respondent's counsel's request to continue the fitness hearing. First, the judge specifically noted, correctly, that he had provided the respondent with notice of the date and time of the hearing. In fact, as described above, the record shows that the judge informed the respondent of the date and time of the October 22, 2020, fitness hearing not only one time, but three times, at the conclusion of the August 31, 2020, hearing. Second, prior to proceeding without the respondent on October 22, 2020, the judge prudently checked Zoom both before and during the hearing to make certain that the respondent—who may have been confused about whether the hearing was in person or on Zoom—was not attempting to attend the hearing via Zoom. Third, Brizendine's testimony during the fitness hearing revealed that she had messaged the respondent to remind him of the hearing, and yet the respondent had still failed to appear. Fourth, when the judge asked counsel for the State if he wished to be heard on the respondent's motion to continue, counsel for the State objected to the continuance, noting that the State had its witness present and was ready to proceed. Fifth—and related to the fourth point—argument and testimony adduced at previous hearings, as well as documents found in the record, made it clear that this case had been going on for over 40 months, and that resolution of the matter was required so that Mariah could have stability and a sense of permanence in her life. In light of all of the foregoing, the judge's decision to proceed with the fitness hearing without the presence of the respondent was a reasonable decision and we decline to disturb it, as we do

17

not find manifest abuse or palpable injustice in the judge's decision. *In re S.W.*, 2015 IL App (3d) 140981, ¶ 31.

¶ 32 We turn now to the respondent's contention that the circuit court's findings regarding the respondent's fitness as a parent, and Mariah's best interest, are against the manifest weight of the evidence. We begin by noting that the State is correct that although the judge's December 3, 2020, written order stated that one of the grounds for the respondent's unfitness was that the respondent failed to make reasonable progress "within the initial 9 months of the adjudication of neglect," the petition to terminate parental rights upon which the fitness hearing was held actually alleged both that (1) the respondent failed to make reasonable efforts to correct the conditions that were the basis for the removal of the child from him during *any* nine-month period after the adjudication of neglect, and that (2) the respondent failed to maintain a reasonable degree of interest, concern, or responsibility for Mariah. Moreover, at the conclusion of the October 22, 2020, fitness hearing, the judge specifically stated that he found by clear and convincing evidence that, *inter alia*, the respondent "did not make reasonable efforts in the period October 2019 to October 2020," did not complete his service plan, and "failed to maintain a reasonable degree in interest concerning responsibility."

¶ 33 It is axiomatic in Illinois that when a conflict exists between a judge's written order and that judge's oral pronouncement of judgment, the oral pronouncement prevails. *In re R.W.*, 371 Ill. App. 3d 1171, 1173 (2007). Thus, the proper question before this court on appeal is whether the judge erred when he found by clear and convincing evidence that, *inter alia*, the respondent "did not make reasonable efforts in the period October 2019 to October 2020," did not complete his service plan, and "failed to maintain a reasonable degree in interest concerning responsibility." In addition, notwithstanding any conflict between the judge's written order and

18

his oral pronouncement of judgement, this court may affirm a judge's ultimate ruling on any basis supported by the record. *Evans v. Lima Lima Flight Team, Inc.*, 373 Ill. App. 3d 407, 418 (2007); *People v. Johnson*, 208 Ill. 2d 118, 134 (2003). We may do so because the question before us on appeal is the correctness of the result reached by the judge, rather than the correctness of the reasoning upon which that result was reached. *Johnson*, 208 Ill. 2d at 128.

¶ 34    In his opening brief on appeal, the respondent focuses his argument on the initial nine-month period following the adjudication of neglect, which, as explained above, is not the appropriate time period to consider, in light of the judge's oral pronouncement that his finding related to the period between October 2019 and October 2020. In his opening brief on appeal, the respondent presents no cogent argument in terms of the evidence presented with regard to the period between October 2019 and October 2020. Accordingly, the respondent has forfeited consideration of his fitness and best interest arguments. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (argument must contain the contentions of the appellant, the reasons therefor, and the citation of authorities; points not argued in an opening brief are forfeited and shall not be raised in the reply brief, in oral argument, or in a petition for a rehearing). Forfeiture notwithstanding, for the following reasons, we find no error.

¶ 35    Parental rights may be terminated only after a finding of unfitness that is supported by clear and convincing evidence. *In re Gwynne P.*, 346 Ill. App. 3d 584, 590 (2004). When a case involves the question of whether a party has made reasonable efforts, the phrase "reasonable efforts" involves a subjective standard and relates to "the goal of correcting the conditions that caused the removal of the child and focuses on the amount of effort reasonable for the particular parent." *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). The court "must determine whether the parent has made 'earnest and conscientious' strides toward correcting the conditions that led to

19

the removal of the minor." *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24. In cases involving termination of parental rights, the circuit court's findings are afforded great deference, because the court had the opportunity to view the witnesses and evaluate the testimony. *In re L.L.S.*, 218 Ill. App. 3d 444, 458 (1991). Accordingly, a finding of unfitness will not be disturbed unless it is against the manifest weight of the evidence. *In re R.L.*, 352 Ill. App. 3d 985, 998 (2004). A finding is against the manifest weight of the evidence only "if the opposite conclusion is clearly evident [citation] or the determination is unreasonable, arbitrary, or not based on the evidence." *In re D.F.*, 201 Ill. 2d 476, 498 (2002). "This court will not reweigh the evidence or reassess witnesses' credibility." *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001).

¶ 36    As noted earlier, with regard to all of his arguments on appeal, the respondent contends that the pandemic prevented the respondent from making reasonable efforts to complete his service plan. Although it is indisputable that the pandemic has had a substantial impact on court and other social services in Illinois, and elsewhere in the world, the uncontradicted evidence presented in this case supports the decision of the judge. As described above, caseworker Chris Brizendine was the only witness to testify at the October 22, 2020, fitness hearing. Her testimony was for the most part consistent with her testimony, also described above, at the August 31, 2020, goal change hearing. When asked why the respondent required domestic violence classes, she testified that he "had been in prison so many times for assaults, we felt the domestic violence [treatment] was necessary." When asked if the respondent cooperated with his service plan, she testified, "I would have to say no. He never really got too involved in any of the services." She testified that he did not complete drug treatment, that he missed required drug screens, and that she believed he "probably" failed more than one drug screen that he did complete, noting a positive test for cocaine in December 2019 and positive tests for amphetamine and

20

methamphetamine. She testified that he did not complete mental health treatment, and that although he did get his initial mental health assessment, thereafter "he never kept his appointments." Brizendine testified that although the respondent "did go" to some domestic violence treatment classes, "he didn't complete" the classes. She testified that the respondent was given multiple opportunities to complete his service plan, but failed to do so.

¶ 37    On cross-examination by counsel for the respondent, Brizendine testified that the respondent had the opportunity to complete his service plans once he was released from the custody of IDOC in 2018. She testified that the respondent "would've had time before [the pandemic] ever started to participate in most of" his domestic violence classes, and that she did not know if he was still attending classes at the start of the pandemic. She testified that she did not believe the respondent's mental health assessment was impacted by the pandemic either. When asked about the respondent's transportation issues, she testified, "We always provided that for visits. We would pick him up, take him to the visit, pick Mariah up. We offered rides to drug treatment or to the drug drops, and I know he had a bus pass so he used that for things." She testified that they also took him to court appearances "a few times," and that she had messaged the respondent to remind him of the October 22, 2020, hearing.

¶ 38    The uncontradicted testimony of Brizendine, as well as the documentation found in the record on appeal (which, as the judge correctly noted at the August 31, 2020, goal change hearing, includes verification of the fact that the respondent tested positive for cocaine in December 2019, prior to the onset of the pandemic in Illinois, and failed to show up for the drug test that was scheduled for him in March 2020), supports the judge's finding by clear and convincing evidence that, *inter alia*, the respondent "did not make reasonable efforts in the period October 2019 to October 2020," did not complete his service plan, and "failed to maintain

21

a reasonable degree in interest concerning responsibility." With regard to the specific finding as to "reasonable efforts," Brizendine's testimony supports that finding as well, because in light of her testimony and the other evidence in the record about the respondent's failure to follow through on his obligations under his service plan throughout this case, a reasonable judge, applying a subjective standard (see *In re M.A.*, 325 Ill. App. 3d at 391), could certainly conclude that the respondent had failed during the period of October 2019 to October 2020 to make earnest and conscientious strides toward correcting the conditions that led to the removal of Mariah, notwithstanding any challenges posed by the pandemic. See *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24. Indeed, a reasonable judge could easily conclude that the respondent's use of cocaine in December 2019, and his failure to show up for his scheduled drug screen in March 2020, was patently inconsistent with earnest and conscientious strides toward the correcting of the conditions that led to the removal of Mariah from him. Even if the pandemic made it difficult to attend to some aspects of his service plan, the respondent could have shown up for the March 2020 drug screen. We find this particularly true in light of Brizendine's testimony that her agency "offered rides to drug treatment or to the drug drops, and I know he had a bus pass so he used that for things." In light of the respondent's December 2019 positive test for cocaine, a reasonable inference for the judge to draw from the respondent's failure to appear for his March 2020 drug screen was that the respondent was still using illegal drugs and knew that he would fail the screen, a pattern of behavior on the part of the respondent that was in no way consistent with earnest and conscientious strides toward the correcting of the conditions that led to the removal of Mariah from him.

¶ 39    We conclude that the opposite conclusion to that reached by the judge is not clearly evident in this case, and the judge's decision is not unreasonable, arbitrary, or not based on the

evidence. Accordingly, the judge's decision is not against the manifest weight of the evidence (see *In re D.F.*, 201 Ill. 2d at 498), and we will not disturb it. *In re R.L.*, 352 Ill. App. 3d at 998.

¶ 40 We next turn to the principles of law relevant to our disposition of the question of Mariah's best interest. "Once the circuit court has found by clear and convincing evidence that a parent is unfit ***, the State's interest in protecting the child is sufficiently compelling to allow a hearing to determine whether the termination of parental rights is in the best interest[ ] of the child." *In re D.M.*, 336 Ill. App. 3d 766, 771 (2002). "[D]uring a [best-interest] hearing, the court focuses upon the child's welfare and whether termination would improve the child's future financial, social[,] and emotional atmosphere." *Id.* at 772. During such proceedings, the State bears the burden of proving by a preponderance of the evidence that termination is in the child's best interest. *In re Anaya J.G.*, 403 Ill. App. 3d 875, 883 (2010). Our standard of review for the circuit court's best-interest determination is the same as for the court's fitness determination: whether the finding is against the manifest weight of the evidence. *Id*. As noted above, a finding is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent or where the finding is unreasonable, arbitrary, and not based upon any of the evidence that was presented to the circuit court. *Id*.

¶ 41 The evidence, described in detail above, supports the trial judge's determination that it was in Mariah's best interest to terminate the respondent's parental rights. The testimony of Brizendine and of Mariah's foster mother overwhelmingly demonstrates that Mariah has a healthy attachment, permanence, stability, security, and familiarity with her foster mother, and is thriving there. Specifically, as recounted above, Brizendine testified that Mariah was provided adequate food and shelter, healthcare, and clothing in her foster home, where she had lived since March 2017. She testified that Mariah has a good relationship with her foster mother, calls her

"Mom," is doing well in school and socially, and is well-adjusted in general. She testified that Mariah has told her "many times" that she wants to stay with her foster mother. She testified that she believed keeping Mariah with her foster mother was the least disruptive way to care for Mariah, because Mariah was "flourishing" under her foster mother's care. With regard to school, Brizendine testified, "Mariah is doing excellent. She's had perfect attendance. She has straight As, A pluses. She has been student of the month. She loves art. She's been on the remote learning and she is doing well." She contrasted that with Mariah's performance when under the care of her biological mother, during which Mariah was "at least a year, year and a half behind" academically. She testified that Mariah's home with her foster mother was stable, and that Mariah was able to attend therapy, which was helping her to "speak[ ] up for herself a lot better." She testified that Mariah's foster mother wished to adopt Mariah. She testified that based upon her training and experience, she did not believe the respondent could care for Mariah as Mariah's foster mother has, even with regard to "simple" matters like providing adequate food and shelter. She testified that she believed it was in Mariah's best interest to be adopted by her foster mother. On cross-examination by counsel for the respondent, Brizendine testified again that after the respondent's release from IDOC, the respondent's early visits with Mariah were not problematic, but that later visits "didn't go so well," and that visits eventually ceased.

¶ 42    Mariah's foster mother, Katrina Robinson, testified that she was ready, willing, and able to adopt Mariah, if the court allowed her to do so. Her testimony with regard to Mariah's adjustment to living in her home was consistent with the testimony of Brizendine. She testified that she was not currently working outside the home, which eliminated the need for day care and babysitters, and allowed her to help Mariah and her other children with their remote schooling.

24

She testified that she loved Mariah and expressed affection for Mariah, and that Mariah loved her and expressed affection for her.

¶ 43    As explained above, our standard of review for the circuit court's best-interest determination is whether the finding is against the manifest weight of the evidence, and a finding is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent or where the finding is unreasonable, arbitrary, and not based upon any of the evidence that was presented to the circuit court. *In re Anaya J.G.*, 403 Ill. App. 3d at 883. In light of the evidence described above, in this case the opposite conclusion to that reached by the judge is not clearly apparent, and the judge's finding is not unreasonable or arbitrary, and is clearly based upon the evidence that was presented in the circuit court. Accordingly, we find no error in the judge's decision.

¶ 44                                   CONCLUSION

¶ 45    For the foregoing reasons, we affirm the judgment of the circuit court of Christian County.


¶ 46    Affirmed.