**NOTICE**
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (4th) 221082-U

NOS. 4-22-1082, 4-22-1083, 4-22-1084 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

**FILED**
April 25, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* Tal. B., Tak. B., and A.A., Minors; | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Adams County |
| Petitioner-Appellee, | ) | Nos. 19JA81 |
| | ) | 19JA82 |
| v. | ) | 19JA83 |
| | ) | |
| Melinda P., | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | John C. Wooleyhan, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Turner and Steigmann concurred in the judgment.

**ORDER**

¶ 1   *Held*: The trial court's determination that it was in the minor children's best interest to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 2   In September 2021, the State filed a motion to terminate the parental rights of respondent, Melinda P., as to her minor children, Tal. B (born May 13, 2008), Tak. B. (born September 29, 2009), and A.A. (born April 2, 2015). The children's fathers are not parties to this appeal. However, the father of Tal. B. and Tak. B. appealed the termination of his parental rights in appellate court case Nos. 4-22-1080 and 4-22-1081. In December 2022, the trial court granted the State's petition and terminated respondent's parental rights.

¶ 3   Respondent appeals, asserting the trial court erred by determining it was in the children's best interest to terminate her parental rights. We affirm.

¶ 4                              I. BACKGROUND

¶ 5            In October 2019, the State filed a petition for adjudication of wardship, alleging

respondent's three children were neglected under section 2-3(1)(b) of the Juvenile Court Act of

1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2018)) in that the children's

environment was injurious to their welfare. The State alleged respondent admitted to being

addicted to methamphetamine and told a caseworker she would come to the office of the Illinois

Department of Children and Family Services (DCFS) to sign temporary guardianship forms

placing the children with a friend while she sought treatment. However, when respondent arrived

at DCFS, she was irrational, aggressive, and appeared to be under the influence. Respondent

again admitted to the use of methamphetamine and destroyed DCFS property by slamming a

door open. The children were placed in protective custody later that day.

¶ 6            The State further alleged respondent lost her employment and was to be evicted

from her apartment. She was currently on felony probation for possession of methamphetamine

and had lost custody of the children while in Missouri in 2017 "for having no food, living out of

a car, and [having] no stability." Respondent tested positive for methamphetamine and was under

the influence during the hearing in that matter. However, the children had been placed back in

her care in 2018. The trial court placed temporary custody and guardianship of the children with

DCFS.

¶ 7            On July 7, 2020, the trial court conducted a hearing. The State presented

witnesses who testified about respondent's drug use and the facts alleged in the petition for

wardship. Patricia Broughton, a "high risk intact worker" with DCFS, testified she was assigned

to respondent's case. In August 2019, respondent told Broughton she wanted Tal. B. placed in

foster care because she felt they were not getting along. Tal. B. told Broughton respondent

frequently locked herself in the bathroom with men and that respondent was in a relationship with a registered sex offender. Tal. B. said respondent would sometimes hit her but indicated respondent never left any injuries or marks on her. Broughton also testified respondent previously discussed her methamphetamine addiction with her. The court found the children were neglected in that they were in an environment injurious to their welfare. The court continued the matter for a dispositional hearing so a written report could be prepared for DCFS by Lutheran Child and Family Services (LCFS), which the record indicates was the agency designated by DCFS to provide case management.

¶ 8      On September 16, 2020, the trial court further continued the matter to October 26, 2020, because LCFS had not filed a dispositional report. The court removed LCFS and reassigned the matter to DCFS.

¶ 9      On October 26, 2020, the trial court held the dispositional hearing. Both LCFS and Chaddock, the new agency designated by DCFS, filed reports. The court stated it considered only the Chaddock report. The report noted, in part, that respondent had a significant substance abuse history but had undertaken some substance abuse treatment. However, respondent had inconsistent contact with the caseworker and had become inconsistent with visitation. The caseworker made multiple attempts to meet with respondent, but respondent failed to attend meetings or complete an integrated assessment. The court found respondent had not engaged in any significant way with any services and had not made measurable progress toward reunification. Accordingly, the court found respondent unfit, adjudicated the children neglected, and placed guardianship with DCFS.

¶ 10      On September 21, 2021, the State filed a petition for termination of parental rights, alleging, in part, respondent was unfit under section 1(D)(m)(i), (ii) of the Adoption Act

(750 ILCS 50/1(D)(m)(i), (ii) (West 2020)) for failure to make (1) reasonable efforts to correct the conditions that were the bases for the removal of the children and (2) reasonable progress toward the return of the children to respondent's care within nine months after the adjudication of neglect. The State filed a document listing the nine-month period as between July 7, 2020, and April 6, 2021. The State later amended the nine-month period to include April 6, 2021, to January 7, 2022.

¶ 11    On June 8, 2022, the trial court terminated respondent's parental rights after a hearing, and respondent appealed. However, in July 2022, the court vacated the order terminating respondent's parental rights because the State had been represented by an unlicensed attorney at the hearing. On December 13, 2022, the court conducted a new hearing. Delaney McDonald, a therapist at Chaddock, testified she was the children's caseworker from October 2020 to December 2021. McDonald identified exhibits showing respondent's service plans and testified about respondent's progress with respect to the goals and tasks stated in the plans.

¶ 12    Regarding the plan covering the period from October 2020 to April 2021, McDonald reported respondent had not been fully engaged with substance abuse treatment. Respondent entered inpatient treatment in February 2021 and successfully completed that treatment in March 2021. However, she did not follow through with recommended outpatient treatment and received an unsatisfactory rating on her substance abuse goal. Respondent also received unsatisfactory ratings on her mental-health treatment and cooperation goals because she failed to engage in services, and there were periods of time when respondent failed to show up for meetings and McDonald could not reach respondent by phone. Respondent received a satisfactory rating on her parenting goal. While respondent did not complete parenting classes, she had appropriate visits with the children.

¶ 13        Regarding the plan covering the period from April 2021 to October 2021, respondent again received unsatisfactory ratings on her substance abuse treatment, mental-health treatment, and cooperation goals. She also received an unsatisfactory parenting rating because her visits were suspended in May 2021 by a court order, and she was dropped from parenting classes in October 2021 because she was in jail. The record shows her probation had been revoked for noncompliance.

¶ 14        Jessica Fuller, a casework at Chaddock, testified about respondent's progress between October 2021 and April 2022. Fuller was unable to contact respondent during that time. Also, during that time, respondent tested positive for tetrahydrocannabinol, methamphetamine, amphetamines, cocaine, and "benzos." The service plan showed respondent failed to attend outpatient substance abuse treatment. Respondent was also discharged from therapy due to noncompliance, and she did not take part in parenting classes. After that nine-month period ended, respondent contacted McDonald and set up a home visit that went well. Respondent also began substance abuse treatment.

¶ 15        The trial court found the State proved the allegations in the petition by clear and convincing evidence and proceeded to hear evidence as to whether it was in the children's best interest to terminate parental rights. Fuller testified the three children had been placed together with a maternal aunt in December 2021, until August 2022, when the older girls, Tal. B. and Tak. B., went to separate placements. Fuller testified the older girls had been struggling within the foster home, which was affecting the caregiver's biological children, so they were placed elsewhere.

¶ 16        Fuller testified the older girls were having "a lot of issues right now" and were referred for therapeutic services. She stated, "[W]e're taking it day by day," and "[a] lot of it is

surrounding *** their mother and their father and the issues as far as placement goes." Fuller further testified, "[I]t's good for now, but it just depends on what kind of services that we can get these girls for their stability."

¶ 17 Regarding Tal. B., Fuller testified she was then14 and appeared bonded with her foster parents. However, given Tal. B.'s age, Fuller did not think adoption was in her best interest, but a guardianship might be possible once she turned 15. There were rules Tal. B. did not necessarily like within the foster home, but she had previously been in the home before she was placed with her maternal aunt, so she was familiar with the family. Tal. B. was up to date on all medical, dental, vision, and hearing care, and she was a straight-A student.

¶ 18 Fuller testified that Tak. B., who was then 13, was struggling with "rules and boundaries" in her foster home and "showing some acting-out behaviors." Fuller thought Tak. B. liked the placement but could not say Tak. B. was bonded with the caregiver since she had been with her for only a few months. The caregiver had reported she was open to adoption and Tak. B. agreed with that. Fuller testified it was Chaddock's intent to have Tak. B. remain in the placement and move toward adoption, but it depended on Tak. B.'s behavior and moving through issues with her biological family through therapeutic services. Tak. B. was also up to date on all medical, dental, vision, and hearing care. Like Tal. B., Tak. B. was also a straight-A student.

¶ 19 According to Fuller's testimony, A.A., then age seven , was doing well in the placement with her maternal aunt, who had expressed her intent to provide permanency for A.A. either through adoption or guardianship. A.A. was bonded with her aunt and loved her very much. Fuller testified A.A. was respectful of her caregiver and there was a balance of structure and nurture. Fuller stated it was a good environment for A.A., who had attention-

deficit/hyperactivity disorder, as "the environment provides well for that diagnosis." A.A.'s aunt provided for her medical care, and A.A. did well in school. Fuller opined it was in the children's best interest to remain in their current placements.

¶ 20    Fuller testified that, in October 2022, respondent tested positive for amphetamines and methamphetamines while also pregnant. She had since given birth, and the children had recently been taken into protective custody. Respondent was currently living in appropriate housing and attending substance abuse treatment. On the date of the hearing, she signed a release for referral for parenting classes and a consent for release of information concerning mental-health treatment. However, Fuller testified that, overall, respondent had not been consistent with her services, and Fuller did not recommend the children be returned to respondent.

¶ 21    The trial court found it was in the best interest of the children to remain in their current placements so their needs could continue to be met. Discussing permanency, the court found there was a lack of evidence to show a relationship existed between the children and respondent. There was also a lack of evidence as to when, if ever, the children would be able to return to any of their biological parents. The court found there was a lack of progress during two separate nine-month periods. The court stated that, under the Adoption Act, if permanency could not be achieved or was not likely to be achieved, "then the cases have to move on for the [c]ourt to try to achieve that for the minors." The court stated, "[t]he law is very clear that minors are not required to wait indefinitely to see if one or more of their parents will be able to have them placed back with them at some unknown time in the future." Thus, the court found the State proved by a preponderance of the evidence that it was in the best interest of the children to terminate parental rights and change the goals of their cases to adoption or guardianship.

¶ 22      This appeal followed.

¶ 23                          II. ANALYSIS

¶ 24      Respondent contends the trial court erred in finding it was in the children's best interest to terminate her parental rights. She argues the evidence does not support the court's findings that factors set forth in the Juvenile Court Act were applicable and that the State failed to prove the matter by a preponderance of the evidence. Respondent does not argue the court erred in its finding of unfitness.

¶ 25      Involuntary termination of parental rights under the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2020)) is a two-step process. *In re J.H.*, 2020 IL App (4th) 200150, ¶ 67. The State must first prove by clear and convincing evidence that the parent is unfit under any single ground listed in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). *Id.* ¶ 67.

¶ 26      Once a parent has been found unfit under one or more grounds set out in the Adoption Act, the State must establish by a preponderance of the evidence that it is in the minor's best interest to terminate parental rights. 705 ILCS 405/2-29(2) (West 2020); *In re Tyianna J.*, 2017 IL App (1st) 162306, ¶ 97. "Proof by a preponderance of the evidence means that the fact at issue *** is rendered more likely than not." *People v. Houar*, 365 Ill. App. 3d 682, 686 (2006). Once a parent is found unfit, the focus shifts to the child, and the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life. *In re D.T.*, 212 Ill. 2d 347, 364 (2004). Thus, following an unfitness finding, the trial court focuses on the needs of the child in determining whether the parental rights should be terminated. *In re J.V.*, 2018 IL App (1st) 171766, ¶ 249. " 'A child's best interest is superior to

all other factors, including the interests of the biological parents.' " *Id.* (quoting *In re Curtis W.*, 2015 IL App (1st) 143860, ¶ 52).

¶ 27 The Juvenile Court Act lists several factors the trial court should consider when making a best-interest determination. Those factors, considered in the context of the child's age and developmental needs, include the following:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009) (citing 705 ILCS 405/1-3(4.05) (West 2008)).

Also relevant in a best-interest determination is the nature and length of the minor's relationship with his or her present caretaker and the effect that a change in placement would have on the child's emotional and psychological well-being. *In re William H.*, 407 Ill. App. 3d 858, 871 (2011).

¶ 28 This court will not reverse a trial court's finding it was in a minor's best interest to terminate his or her parental rights unless it is against the manifest weight of the evidence. *In re Anaya J.G.*, 403 Ill. App. 3d 875, 883 (2010). A finding is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *Id.*

¶ 29        Here, the record shows the trial court's determination was not against the manifest weight of the evidence. The court noted the requirements of the Juvenile Court Act, and its findings were supported by the evidence. The court found the children needed stability, and their foster parents' homes met their physical, mental health, medical, and educational needs. The children were doing well in school, and they were generally doing well in their placements. Two of the children were in placements the court could reasonably find would lead to permanency, while guardianship might be possible for Tal. B. While there was evidence the older girls were "struggling," Fuller testified that was in part a consequence of their biological parent's behavior, and their caregivers were seeking appropriate services to address those issues. Respondent did nothing to rebut that opinion. As the court noted, respondent further failed to present any evidence as to her relationship with the children, her ability to care for them, or her ability to provide the stability they need. Under these circumstances, where the children are well cared for in their placement and respondent's inability to provide permanency in the foreseeable future was well established, the facts do not clearly demonstrate the court should have reached the opposite result in making its best-interest determination.

¶ 30        Respondent argues she had recently taken steps to address her methamphetamine addiction, attend parenting classes, and address her mental-health issues, and she asserts the best chance for the children to obtain permanency is with her. But she also had recently tested positive for amphetamines and methamphetamine while pregnant. Moreover, the record shows respondent's pattern of repeatedly failing to address her issues to be able to meet the children's needs.

¶ 31        Essentially, respondent is simply asking this court to reweigh the evidence, something which we cannot do under a manifest weight of the evidence analysis. It is the

province of the trier of fact to weigh the evidence, resolve conflicts in testimony, and assess the credibility of the witnesses. *People v. Evans*, 209 Ill. 2d 194, 209-10 (2004). This court has long held, "A reviewing court is not in a position to reweigh the evidence, but can merely determine if the decision is against the manifest weight of the evidence." *Tate v. Illinois Pollution Control Board*, 188 Ill. App. 3d 994, 1022 (1989) (citing *Jackson v. Board of Review of the Department of Labor*, 105 Ill. 2d 501, 506 (1985)). Further, the trial court "receives broad discretion and great deference" in matters involving minors. *In re D.D.*, 2022 IL App (4th) 220257, ¶ 28 (citing *In re E.S.*, 324 Ill. App. 3d 661, 667 (2001)). In sum, we agree with the State that [the evidence adequately addressed multiple statutory factors and the trial court's best-interest determination was not against the manifest weight of the evidence.

¶ 32                                    III. CONCLUSION

¶ 33            For the reasons stated, we affirm the trial court's judgment.

¶ 34            Affirmed.