NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 250500-U

NO. 4-25-0500

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 10, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| In re H.P., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Tazewell County |
| Petitioner-Appellee, | ) | No. 21JA283 |
| v. | ) | |
| John P., | ) | Honorable |
| Respondent-Appellant). | ) | Katherine G. P. Legge, |
| | ) | Judge Presiding. |

---

JUSTICE LANNERD delivered the judgment of the court.
Justices Doherty and Grischow concurred in the judgment.

**ORDER**

¶ 1   *Held*: The appellate court affirmed, concluding the trial court's finding that termination of respondent's parental rights was in the minor's best interest was not against the manifest weight of the evidence.

¶ 2   In March 2024, the State filed a petition to terminate the parental rights of respondent, John P., to his minor child, H.P. (born in 2017). On May 14, 2025, the trial court entered an order terminating respondent's parental rights. Respondent timely appeals, arguing the court's finding that it was in H.P.'s best interest respondent's parental rights be terminated was against the manifest weight of the evidence. We affirm.

¶ 3                                I. BACKGROUND

¶ 4   At the outset, we note this case comes to us following remand for a new termination hearing. Consequently, we discuss only those facts necessary to address respondent's argument in this appeal. For a more detailed recitation of the factual background, see *In re H.P.*, 2025 IL App

(4th) 241095-U.

¶ 5    On March 6, 2024, the State filed a three-count petition to terminate the parental rights of respondent and H.P.'s mother, Chastity P. Count III of the petition alleged respondent's depravity based on his conviction for four specified felonies within the preceding five years. Respondent filed an answer on April 19, 2024, which stipulated the State could prove the allegations in the petition.

¶ 6    The original hearing on the State's petition took place on August 2, 2024. At that hearing, the State requested the trial court take notice of respondent's stipulation and find the stipulation sufficient to support a finding of respondent's unfitness. The court did so and then proceeded to a best interest hearing. After hearing evidence and argument, the court found termination of respondent's parental rights was in H.P.'s best interest. Respondent appealed, and, in January 2025, this court remanded the matter, holding the trial court erred by failing to set forth a factual basis for its finding respondent was unfit. *Id.* ¶ 28.

¶ 7    On remand, the trial court conducted a new termination hearing on May 9, 2025. At the fitness portion of the hearing, the court found respondent's stipulation provided a factual basis for a finding of unfitness based on depravity. It then immediately proceeded to a best interest hearing.

¶ 8    H.P.'s foster mother, Jennifer W., testified she was H.P.'s great aunt. H.P., who was then seven years old, had been living with Jennifer since October 21, 2021, which was also when H.P. last saw respondent. The "whole family" had lived with Jennifer for two months before H.P. came into her care. Jennifer made sure H.P. attended school and medical appointments. She loved H.P. "with every ounce of [her] heart" and was willing and able to adopt her. Jennifer agreed respondent had seen H.P. no more than twice since October 21, 2021; she noted this was due to "a

court order."

¶ 9      Julie Eubanks, H.P.'s caseworker since the opening of the case, testified she observed H.P. interact with Jennifer. The two had a loving relationship and were bonded. H.P. called her foster mother "Aunt Jen" and her foster father "Uncle Chris." Eubanks believed it was in H.P.'s best interest for her foster parents to adopt her.

¶ 10     On cross-examination by respondent's counsel, Eubanks said she observed respondent with H.P. and did not believe the two had a bond. She agreed this could be because respondent was unable to visit H.P., but she thought the events causing H.P. to come into protective care constituted another reason for the absence of a bond. Additionally, Eubanks acknowledged H.P. thought of her foster family as her family and her foster parents' community as her community.

¶ 11     Following cross-examination by respondent's counsel, Caitlin Paluska, H.P.'s guardian *ad litem* (GAL), asked Eubanks, who was qualified as a therapist, what would happen to H.P. if respondent reentered her life. Eubanks responded: "I think that her mental health would deteriorate quickly. I've been watching her since *** the beginning, and being qualified *** for mental health, *** it's played a big part in it. She still struggles."

¶ 12     Respondent elected to testify. He last saw H.P. just before Thanksgiving in 2021. H.P. was crying, so respondent told her things would work out and she should "stiffen up her bottom lip." On November 30, 2021, respondent was arrested and then imprisoned. Thereafter, he had no further contact with H.P.

¶ 13     When respondent last had contact with H.P., she loved dolls. She also loved being outside with him when he was hunting. Respondent believed the trial court should not terminate his parental rights because he had been a big part of H.P.'s life.

¶ 14　　　　　On cross-examination, respondent testified he believed H.P. attended Glenwood Elementary School, based on where she was living. However, he had no idea who her teacher was. He also testified he expected her favorite class to be art because she always loved drawing. However, he acknowledged her interest might have changed because "[k]ids grow up."

¶ 15　　　　　On redirect examination, respondent admitted he knew little about H.P.'s life because he received few reports from the Illinois Department of Children and Family Services or Eubanks.

¶ 16　　　　　When questioned by the trial court, respondent described his time with H.P. before his arrest. He worked third-shift and would spend time with her during the day. For instance, he took her to and from school and to ride her bike along a riverfront.

¶ 17　　　　　After respondent's testimony, Paluska provided an oral GAL report to the trial court. Paluska observed H.P. and Jennifer together and believed they had an extremely strong bond. Jennifer and her husband had many plans for their future with H.P. Additionally, H.P. had become more relaxed as the court proceedings moved toward termination of parental rights and adoption by her foster parents. Paluska also raised concerns about respondent's social media posts, one of which involved a "cartoon *** about using a belt to hurt someone."

¶ 18　　　　　Following arguments by the parties, the trial court found termination of respondent's parental rights was in H.P.'s best interest. In doing so, the court explicitly addressed 7 of the 10 factors set forth in section 405/1-3(4.05) of the Juvenile Court Act of 1987 (705 ILCS 405/1-3(4.05) (West 2024)), which sets forth the factors a court must consider when it makes a " 'best interest' determination." The court found all H.P.'s basic needs, including shelter and physical safety and welfare, were being met in her placement. See *id.* § 1-3(4.05)(a). It stated the "development of the child's identity" (see *id.* § 1-3(4.05)(b)) weighed in favor of termination in

that "she wants Aunt Jen to be her mom and Uncle Chris to be her dad." Concerning section 1-3(4.05)(c) of the Juvenile Court Act (*id.* § 1-3(4.05)(c)), "[t]he child's background and ties both family, cultural, religious," it noted H.P. was in a family placement in which she was recovering from "several mental health challenges due to her background." Addressing "[t]he child's sense of attachment" (see *id.* § 1-3(4.05)(d)), it found the placement had given H.P. a setting in which she felt valued and could recover from trauma. It deemed H.P.'s "[c]ontinuity of affection" (see *id.* § (4.05)(d)(iv)) would be extremely disrupted if she left the care of her foster parents, making her fosters parent the "[l]east disruptive placement alternative" (see *id.* § 1-3(4.05)(d)(v)). It noted H.P. had become involved in the equestrian community; this related both to her sense of attachment and her "community ties" (see *id.* §1-3(4.05)(f)). Her ties to her foster family's community were also shown by her enjoyment of spending time with her neighbors. It found H.P.'s need for stability (see *id.* § 1-3(4.05)(g)) was amply satisfied by her foster family. Further, H.P. was old enough to express her own preferences for who would care for her (see *id.* § 1-3(4.05)(e)) and had been clear in saying she wanted to stay with her foster family.

¶ 19　　　　The trial court recognized respondent's love for H.P. and his desire to remain in contact with her. However, it noted respondent lost the right to be in contact with H.P. through his own unlawful actions. It concluded respondent's desire to remain a part of H.P.'s life was outweighed by the many factors favoring H.P. remaining with her foster parents and being adopted by them.

¶ 20　　　　On May 14, 2025, the trial court entered an order finding both conditions for termination of respondent's parental rights had been met: respondent was unfit and termination was in H.P.'s best interest.

¶ 21　　　　This appeal followed.

¶ 23        On appeal, respondent argues the trial court's finding that termination of his parental rights was in H.P.'s best interest was against the manifest weight of the evidence. He contends the evidence demonstrated he had a close relationship with H.P. before his incarceration and he retained "a significant bond with H.P. during the three years his case was pending despite his incarceration." Respondent maintains that, because he was now on work release, he was "potentially able to provide a better life for himself and his daughter. His life was effectively back on track. The trial court simply failed to give this evidence its proper weight."

¶ 24        When a trial court finds a parent to be unfit, "the court then determines whether it is in the best interests of the minor that parental rights be terminated." *In re D.T.*, 212 Ill. 2d 347, 352 (2004). At the best interest phase, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* at 364. The State must prove termination is in the minor's best interest by a preponderance of the evidence. *Id.* at 367. When considering whether termination of parental rights would be in the minor's best interest, the court must consider the following statutory factors:

> " '(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least[-]disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to

care for the child.' " *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 52 (quoting *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006)).

See also 705 ILCS 405/1-3(4.05) (West 2024). Although all the statutory factors must be considered, the court is "not required to explicitly reference each factor" in its decision. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 32. This court will not reverse a best interest finding unless it is against the manifest weight of the evidence. *In re Anaya J.G.*, 403 Ill. App. 3d 875, 883 (2010). A finding is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *Id.*

¶ 25        In this case, respondent offered no basis on which we can hold the trial court's best interest finding was against the manifest weight of the evidence. Respondent's argument, *in toto*, is as follows:

"Applied here, the evidence showed [respondent] shared a significant bond with H.P. during the three years this case was pending despite his incarceration. The trial court highlighted [his] love and affection for his daughter and mentioned [his] fond memories of their past father-child activities when H.P[.] was nearly 4 years old. [Citation.] [Respondent] was the parent who took H.P. to and from school. [Citation.] H.P. would run up and hug him when [he] picked her up from school. [Citation.] They hunted and fished, rode bikes, and went on walks together. [Citation.] [Respondent] called her the smartest, most beautiful girl in the world. [Citation.] He expressed unequivocal love for his daughter and confidently told the trial court that H.P.'s life would be better with him in it. [Citation.] And although he was admittedly incarcerated and prohibited from having contact with H.P. during much of this case, [he] was no longer in prison as of the date of best interest

- 7 -

hearing, May 9, 2024; he was out on work release. [Citation.] Therefore, [respondent] was potentially able to provide a better life for himself and his daughter. His life was effectively back on track. The trial court simply failed to give this evidence its proper weight."

This argument fails to explain how the court's best interest ruling was against the manifest weight of the evidence. The court, while acknowledging respondent's love for H.P., meticulously addressed how the statutory factors favored finding termination was in H.P.'s best interest. Respondent does not suggest any of those findings were incorrect. Instead, he asserts, without citation to authority, his bond with H.P. should outweigh the court's findings. We disagree. The existence of a bond between a parent and child, standing alone, does not compel the conclusion that termination of parental rights is against the manifest weight of the evidence. *In re Angela D.*, 2012 IL App (1st) 112887, ¶ 39. Moreover, at the time of the best interest hearing, respondent had not been in contact with H.P. for several years due to his incarceration. H.P.'s caseworker also testified H.P. lacked a bond with respondent. Conversely, the caseworker testified H.P. and her foster mother had a loving relationship and were bonded. The GAL likewise believed H.P. and her foster mother had an extremely strong bond. H.P.'s needs were being met in her foster placement, and her foster parents were willing to provide permanency through adoption.

¶ 26 Under the circumstances presented, the record fails to clearly demonstrate that the trial court should have reached the opposite result, and, thus, its finding that termination of respondent's parental rights was in H.P.'s best interest was not against the manifest weight of the evidence.

¶ 27 III. CONCLUSION

¶ 28 For the reasons stated, we affirm the trial court's order terminating respondent's

parental rights.

¶ 29        Affirmed.